WYMAN-GORDON CO. AND ROME INDUSTRIES, INC., PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 32520-83.      Filed July 30, 1987.

*Richard A. Brady* and *Richard D. Buik*, for the petitioners.

*Wilton A. Baker*, *Warren P. Simonsen*, and *Lawrence D. Garr*, for the respondent.

OPINION

SWIFT, *Judge*: In a timely statutory notice of deficiency dated August 25, 1983, respondent determined deficiencies in the consolidated Federal income tax liabilities of petitioners Wyman-Gordon Co. and Rome Industries, Inc., members of an affiliated group of corporations, as follows:

| Year | Deficiency |
|------|------------|
| 1977 | $387,087 |
| 1978 | 1,019,439 |
| 1979 | 1,213,363 |

After concessions and resolution of all issues pertaining to 1977 and 1979, the sole issue for decision concerns the effect of discharge of indebtedness income on the computation of earnings and profits and on the computation of a taxpayer's excess loss account balance under the consoli-

dated tax return provisions of the Code. All of the facts have been stipulated, and this case was submitted for decision under Rule 122, Tax Court Rules of Practice and Procedure.

Petitioner Wyman-Gordon Co., a publicly held corporation the stock of which is traded on the over-the-counter market, is organized under the laws of the State of Massachusetts and maintained its principal office in Worchester, Massachusetts, at the time of filing the petition in this case. Wyman-Gordon is a manufacturer of metal products and is the common parent of an affiliated group of manufacturing corporations that filed consolidated Federal income tax returns for each of the years at issue herein. The affiliated group included Rome Industries, Inc. (hereinafter referred to as Rome), a first-tier subsidiary of Wyman-Gordon, and Woods & Copeland Manufacturing, Inc. (hereinafter referred to as Woods & Copeland), a second-tier subsidiary wholly owned by Rome.[1]

Rome is organized under the laws of the State of Georgia, and its principal office is in Cedartown, Georgia. Woods & Copeland was organized under the laws of the State of Texas, and its principal office was also in Cedartown, Georgia, before its liquidation in 1978.

Rome acquired all of the stock of Woods & Copeland in August of 1976 from unrelated third parties at a cost of $484,000. Shortly thereafter, Wyman-Gordon made the first of several loans to Woods & Copeland to provide it with operating capital. Woods & Copeland executed a recourse promissory note to Wyman-Gordon for the principal amount of each loan. The promissory notes generally matured in 90 days, after which they became payable to Wyman-Gordon on demand. The promissory notes bore simple interest at varying market rates. Of the total amount Wyman-Gordon loaned to Woods & Copeland from 1976 to 1978, $4,542,208 remained outstanding as of December 14, 1978.[2]

---

[1] Other members of the affiliated group in 1978 were Reisner Metals, Inc., Rollmet, Inc., Jackson Crankshaft Co., Rome International Corp., Wyman-Gordon International, Inc., and Romesa do Brazil Industria e Comercia, Ltd.

[2] Respondent's untimely motion to amend his answer to challenge the character of the loans from Wyman-Gordon to Woods & Copeland and to treat them as contributions of capital was denied. *Wyman-Gordon Co.* and *Rome Industries, Inc. v. Commissioner*, T.C. Memo. 1985-433.

Rome also made loans to Woods & Copeland in 1978 in the total principal amount of $425,000. Of that amount, $248,289 was repaid in 1978, and $176,711 remained unpaid as of December 14, 1978. The loans from Rome to Woods & Copeland were reflected by recourse promissory notes, matured in 90 days, and bore simple interest at varying market rates. Upon expiration of 90 days, Woods & Copeland's promissory notes to Rome became payable on demand.

On November 30, 1978, Wyman-Gordon demanded payment from Woods & Copeland of $4,542,208, representing the total outstanding principal on the promissory notes of Woods & Copeland. On December 14, 1978, Woods & Copeland transferred all of its assets to Wyman-Gordon in partial satisfaction of the $4,542,208 due on the promissory notes. The net value of the assets that Woods & Copeland transferred to Wyman-Gordon pursuant to the demand made on its indebtedness to Wyman-Gordon was $2,504,047, which Wyman-Gordon applied against Woods & Copeland's outstanding debt, and Wyman-Gordon then canceled or discharged Woods & Copeland's remaining $2,038,161 indebtedness to it. Thereafter, Woods & Copeland was formally dissolved, but its businesses were continued by Rome. On its 1978 consolidated Federal income tax return, Wyman-Gordon claimed a bad debt deduction in the amount of $2,038,161, reflecting the principal amount of the Woods & Copeland indebtedness discharged by Wyman-Gordon.

Woods & Copeland reported net operating losses for 1977 and 1978 in the respective amounts of $1,251,775 and $1,655,746. These losses were used to offset 1977 and 1978 consolidated taxable income of the affiliated group.[3]

Because Woods & Copeland was insolvent at the end of 1978, Woods & Copeland did not include in its 1978 taxable income the $2,038,161 discharge of indebtedness income. Woods & Copeland, however, included the $2,038,161 discharge of indebtedness income in its earnings and profits for 1978, and the earnings and profits of Woods & Copeland

---

[3]Woods & Copeland also incurred a net operating loss for 1976, but the amount thereof is not reflected in the record.

were used by Rome to make adjustments to Rome's basis in the stock of Woods & Copeland.

Due to net operating losses realized by Woods & Copeland in 1976 and 1977, and the resulting adjustments to the basis of Rome's stock in Woods & Copeland at the end of each of those years, Rome had established an "excess loss account" in the amount of $939,669 with respect to its stock in Woods & Copeland.

Generally, a corporation that joins in filing a consolidated Federal income tax return is required to include in taxable income the balance of its excess loss acccount, if any, upon the occurrence of specified "disposition" events. Rome, however, eliminated the $939,669 balance in its excess loss account at the end of 1978 with respect to its investment in Woods & Copeland by including the $2,038,161 discharge of indebtedness income in Woods & Copeland's 1978 earnings and profits (even though such amount was excluded from Woods & Copeland's taxable income due to its insolvency).

In addition, Rome claimed on the 1978 consolidated Federal income tax return a worthless stock deduction in the amount of $398,584, with respect to its basis in the Woods & Copeland stock. Rome also claimed on the 1978 consolidated Federal income tax return a bad debt deduction in the amount of $176,711, with respect to the unpaid loans Rome had made to Woods & Copeland in 1978.

In his notice of deficiency, respondent determined that Woods & Copeland was not entitled to include the $2,038,161 discharge of indebtedness income in its earnings and profits computation for 1978 and that Rome therefore must include in its 1978 taxable income the redetermined balance (namely, $1,384,155) of Rome's excess loss account with respect to its stock in Woods & Copeland. Respondent also disallowed Rome's claimed worthless stock loss of $398,584 on the ground that Rome had no remaining basis in its stock in Woods & Copeland.

Pursuant to Congress' express delegation of authority in section 1502,[4] the Secretary of the Treasury has promulgated regulations governing the filing of consolidated Federal income tax returns by affiliated corporations. The

---

[4]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

Secretary's consolidated return regulations are thus legislative in character and carry the force and effect of law. *Woods Investment Co. v. Commissioner*, 85 T.C. 274, 279 (1985); *Georgia-Pacific Corp. v. Commissioner*, 63 T.C. 790, 801-802 (1975).

Under those regulations, the losses of a subsidiary may be used without limitation within a consolidated Federal income tax return to offset the profits of other members of the affiliated group, even though the losses of the subsidiary exceed the parent's basis in the subsidiary's stock. As a result, the taxable income or loss of the affiliated group may become distorted because losses of the subsidiary used to offset income of the consolidated group may exceed true economic losses (i.e., tax losses of a subsidiary used by the affiliated group may exceed the total cost of the affiliated group's investment in the subsidiary). To compensate in part for this potential distortion, the regulations under the consolidated return provisions of the Code require yearend adjustments to the parent's cost basis of its investment in the stock of a subsidiary where tax losses of the subsidiary are included in the consolidated taxable income of the affiliated group. Secs. 1.1502-19 and 1.1502-32, Income Tax Regs.; *Covil Insulation Co. v. Commissioner*, 65 T.C. 364, 370 (1975).

A primary objective of this "investment adjustment" is to prevent the affiliated group from obtaining a double tax benefit—first, when the group's consolidated income is reduced by the subsidiary's losses, and second, when the stock of the subsidiary is disposed of at a loss or at a reduced gain. *Ilfeld Co. v. Hernandez*, 292 U.S. 62, 68 (1934). The required investment adjustment also prevents income of a subsidiary that was included in consolidated income from being subject to tax a second time when the parent disposes of the subsidiary's stock. See generally J. Crestol, K. Hennessey, & A. Rua, The Consolidated Tax Return, par. 6.03[1], at 6-7 (1980); F. Peel, Consolidated Tax Returns, sec. 16:02, at 4 (3d ed. 1984); H. Lerner, R. Antes, R. Rosen & B. Finkelstein, Federal Income Taxation of Corporations Filing Consolidated Returns, sec. 18:01, at 18-2, 18-3 (1986).

The amount of the yearend investment adjustment is described in the regulations as the difference between the required "positive adjustment" and the required "negative adjustment." Sec. 1.1502-32(a), Income Tax Regs.[5] Gener-

[5]Sec. 1.1502-32, Income Tax Regs., provides in relevant part:

Investment adjustment.

(a) *In general.* As of the end of each consolidated return year, each member owning stock in a subsidiary shall adjust the basis of such stock in the manner prescribed in this section. * * * The amount of such adjustment shall be the difference between the positive adjustment described in paragraph (b)(1) or (c)(1) of this section, whichever is applicable, and the negative adjustment described in paragraph (b)(2) or (c)(2) of this section, whichever is applicable. Such difference is referred to in this section as the "net positive adjustment" or the "net negative adjustment", as the case may be.

(b) *Stock which is not limited and preferred as to dividends.* (1) *Positive adjustment.* The positive adjustment with respect to a share of stock which is not limited and preferred as to dividends shall be the sum of—

(i) An allocable part of the undistributed earnings and profits of the subsidiary for the taxable year;

(ii) An allocable part of the portion of any consolidated net operating loss or consolidated net capital loss for the taxable year which is attributable to such subsidiary under sec. 1.1502-79(a)(3) or (b)(2), and which is not carried back and absorbed in a prior taxable year; and

(iii) If such subsidiary owns stock in another subsidiary and sec. 1.1502-33(c)(4)(i) applies to the taxable year, an allocable part of the net positive adjustment made by the higher tier subsidiary for the taxable year with respect to its stock in such other subsidiary.

(2) *Negative adjustment.* The negative adjustment with respect to a share of stock which is not limited and preferred as to dividends shall be the sum of—

(i) An allocable part of the deficit in earnings and profits of the subsidiary for the taxable year (determined under sec. 1.1502-33);

(ii) An allocable part of any net operating loss or net capital loss incurred by the subsidiary in a prior separate return year, and of any portion of a consolidated net operating loss or consolidated net capital loss incurred by the group in a prior consolidated return year which is attributable to such subsidiary under sec. 1.1502-79(a)(3) or (b)(2), and which is carried over and absorbed in the taxable year;

(iii) Distributions made by the subsidiary during the taxable year with respect to such share out of earnings and profits of the subsidiary—

(a) Accumulated in prior consolidated return years beginning after December 31, 1965;

(b) Accumulated in preaffiliation years of the subsidiary, and if the distribution occurs on or before August 9, 1979; or

(c) Accumulated in separate return limitation years of the subsidiary, if the distribution occurs after August 9, 1979; and

     \*     \*     \*     \*     \*     \*     \*

(e) *Application of adjustment*—(1) *Net negative adjustment.* A member owning stock in a subsidiary shall apply its net negative adjustment to reduce its basis for such stock. Any excess of such adjustment over basis is herein referred to as such member's "excess loss account."

(2) *Net positive adjustment.* A member owning stock in a subsidiary shall apply its net positive adjustment with respect to such stock to reduce its excess loss account, if any, with respect to such stock. Any excess of such adjustment over the excess loss account shall be applied to increase the member's basis for such stock.

(3) *Subsequent investment.* If a member has an excess loss account with respect to stock in a subsidiary, any increase in the basis of such stock as a result of a contribution to the capital of the subsidiary (or any basis in stock of the same class or of a similar class acquired with respect to such contribution) shall be applied against and reduce the excess loss account. For example, if corporation P has an excess loss account of $100 in the stock of its wholly owned subsidiary, S, and P transfers $150 to S in a transaction described in section 351, the excess loss account is reduced to zero and P has a $50 basis in the stock of S.

ally, the amount of a subsidiary's yearend undistributed earnings and profits that increases consolidated taxable income results in a positive adjustment and increases the parent's basis in the stock. Sec. 1.1502-32(b)(1)(i), Income Tax Regs. A loss of a subsidiary that is used to reduce the affiliated group's consolidated income results in a negative adjustment and decreases the parent's basis in the subsidiary's stock. Sec. 1.1502-32(b)(2)(i), Income Tax Regs.; *Covil Insulation Co. v. Commissioner, supra* at 371.

The positive and negative adjustments are netted at the end of each taxable year. If a yearend net negative adjustment exceeds the parent's basis in the stock of a subsidiary, the parent must establish an "excess loss account" with respect to the stock it owns in the subsidiary. Sec. 1.1502-32(e)(1), Income Tax Regs.

When a parent corporation sells or otherwise "disposes" of stock in a subsidiary, the parent is required under section 1.1502-19(a)(1), Income Tax Regs., to include in income the balance of any excess loss account outstanding with respect to its stock in that subsidiary immediately before the disposition event occurred.[6] In most cases, upon the occurrence of a disposition event, the balance of an excess loss

---

[6]Sec. 1.1502-19, Income Tax Regs., provides in relevant part:

Excess losses.

(a) *Recognition of income*—(1) *In general.* Immediately before the disposition (as defined in paragraph (b) of this section) of stock of a subsidiary, there shall be included in the income of each member disposing of such stock, that member's excess loss account (determined under secs. 1.1502-14 and 1.1502-32) with respect to the stock disposed of.

(2) *Character of income.* (i) *In general.* Except to the extent otherwise provided in this subparagraph, the amount included in income under subparagraph (1) of this paragraph shall be treated as gain from sale of stock (that is, as capital gain or ordinary income, as the case may be).

(ii) *Insolvency.* If, at the time of the disposition of stock of a subsidiary, the subsidiary is insolvent, then the amount included in income under subparagraph (1) of this paragraph, minus all amounts which increased the excess loss account under sec. 1.1502-14(a)(2) for any consolidated return year, shall be treated as ordinary income to the extent of such insolvency. For purposes of the preceding sentence, a subsidiary is insolvent to the extent that the sum of—

(a) All its liabilities,

(b) All its liabilities which were discharged during consolidated return years to the extent such discharge would have resulted in "cancellation of indebtedness income" but for the insolvency of such subsidiary, and

(c) The amounts to which all stock of such subsidiary which is limited and preferred as to dividends is entitled in liquidation, exceeds the fair market value of such subsidiary's assets. This subdivision shall not apply to the extent that the taxpayer establishes to the satisfaction of the Commissioner that the ordinary income portion of the excess loss account is attributable to losses of the subsidiary which reduced long-term capital gains of the group (without regard to section 1201).

account will be taken into income as capital gain. Sec. 1.1502-19(a)(2)(i), Income Tax Regs. Where the subsidiary is insolvent, however (as was Woods & Copeland at the end of 1978), the balance of an excess loss account is to be taken into income as ordinary income. Sec. 1.1502-19(a)(2)(ii), Income Tax Regs.

To summarize the above basis adjustment rules insofar as they are pertinent to the issue before us, an affiliated group of corporations that files a consolidated Federal income tax return is able to reduce its consolidated taxable income each year by deducting tax losses of a subsidiary that are in excess of the group's true economic losses (i.e., in excess of the amount invested in the subsidiary). If the losses are temporary and if the subsidiary has sufficient undistributed earnings and profits in later years, the balance in the excess loss account may be eliminated. Where, however, the parent disposes of the stock in the subsidiary before the subsidiary's economic turnaround, the balance in the excess loss account immediately before the disposition event occurred is treated as the equivalent of an "amount realized" by the parent (because the parent was allowed to reduce consolidated taxable income by that amount even though the losses exceeded the parent's adjusted basis in the subsidiary). Accordingly, in that situation, the balance in the excess loss account is to be included in the parent's consolidated taxable income.

The narrow and difficult issue we must decide in this case is whether the $2,038,161 discharge of indebtedness income realized by Woods & Copeland increases the earnings and profits of Woods & Copeland and thereby reduces to zero Rome's excess loss account with respect to its stock in Woods & Copeland, even though such discharge of indebtedness income was not included in consolidated taxable income. This issue turns on whether discharge of indebtedness income may be included in the earnings and profits of a corporation even though it is excluded from taxable income where the inclusion in earnings and profits would effectively allow an affiliated group of corporations excessive tax benefits by avoiding recognition of an excess loss account balance.

Petitioners argue that such a rule exists and that any double deduction or excessive tax benefits they will receive is attributable to the Treasury's failure to specifically provide otherwise in the regulations under section 1502. Respondent argues that no such rule exists, that the result sought by petitioners is contrary to the overriding policy of the consolidated return regulations to prevent the avoidance of tax liability, and that such result is not required by the Code or the regulations governing the computation of earnings and profits. Respondent also argues that the policies underlying the regulations applicable to excess loss accounts would be subverted if petitioners' position is adopted. For the reasons discussed below, we agree with respondent.

Section 1502 sets forth an overriding objective of the rules and regulations governing the filing of consolidated Federal income tax returns, as follows:

SEC. 1502. REGULATIONS.

The Secretary shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income tax liability and the various factors necessary for the determination of such liability, *and in order to prevent avoidance of such tax liability*. [Emphasis added.]

An early Senate Finance Committee report concerning the consolidated tax return provisions of the Revenue Act of 1918,[7] still pertinent to the issue before us, stated—

So far as its immediate effect is concerned consolidation increases the tax in some cases and reduces it in other cases, but its general and permanent effect is to prevent evasion which can not be successfully blocked in any other way. * * * [S. Rept. 617, 65th Cong., 3d Sess. (1918), 1939-1 C.B. (Part 2) 117, 123.]

With regard to the consolidated tax return provisions of the Revenue Act of 1928,[8] the Senate Finance Committee report stated—

---

[7]Revenue Act of 1918, ch. 18, 40 Stat. 1057.
[8]Revenue Act of 1928, ch. 852, 45 Stat. 791.

Much of the misapprehension about consolidated returns will be removed when it is realized that it is only when the corporations are really but one corporation that the permission to file consolidated returns is given, and that no ultimate advantage under the tax laws really results. * * * [S. Rept. 960, 70th Cong., 1st Sess. (1928), 1939-1 C.B. (Part 2) 409, 418.]

With regard to the strong policy against allowing double deductions in the context of consolidated tax returns and in the context of an issue not significantly dissimilar from that presented herein, the Supreme Court, in an early case, stated:

The allowance claimed would permit petitioner twice to use the subsidiaries' losses for the reduction of its taxable income. By means of the consolidated returns in earlier years it was enabled to deduct them. And now it claims for 1929 deductions for diminution of assets resulting from the same losses. If allowed, this would be the practical equivalent of double deduction. In the absence of a provision of the Act definitely requiring it, a purpose so opposed to precedent and equality of treatment of taxpayers will not be attributed to lawmakers. * * * [*Ilfeld Co. v. Hernandez*, 292 U.S. 62, 68 (1934).]

In 1976, 1977, and 1978, Woods & Copeland realized net operating losses that reduced the consolidated taxable income of the affiliated group. As a result of those losses, Woods & Copeland had a deficit earnings and profits account, and consequently Rome's basis in the stock of Woods & Copeland was reduced below zero and an excess loss account was created.

In that situation, the regulations under section 1502 expressly provide that upon "disposition" of the stock of a subsidiary, the parent corporation is required to recognize as income the balance of the excess loss account with respect to its subsidiary's stock. Furthermore, section 1.1502-19(b)(2), Income Tax Regs., expressly provides that the realization of discharge of indebtedness income where such income is not included in taxable income constitutes a "disposition" event and triggers recognition of the excess loss account. Section 1.1502-19(b)(2), Income Tax Regs., provides as follows:

(2) *Disposition of all shares.* Except as otherwise provided in paragraphs (d) and (e) of this section, a member shall be considered for purposes of this section as having disposed of all of its shares of stock in a subsidiary—

\* \* \* \* \* \* \*

(iii) On the last day of each taxable year of such subsidiary in which any of its stock is wholly worthless (within the meaning of section 165(g)), or *in which an indebtedness of the subsidiary is discharged if such discharge would have resulted in "cancellation of indebtedness income" but for the insolvency of the subsidiary.* [Emphasis added.]

As previously explained, the regulations also provide that upon the occurrence of one of the specified disposition events, the excess loss account generally will be included in taxable income as capital gain. Sec. 1.1502-19(a)(2)(i), Income Tax Regs. Where, however, at the time of the disposition event the subsidiary is insolvent, as in the instant case, the balance of the excess loss account will be included in taxable income as ordinary income. Sec. 1.1502-19(a)(2)(ii), Income Tax Regs. The policy underlying this rule has been explained as follows:

Presumably, ordinary income treatment was provided for excess loss accounts in insolvency cases on the theory that insolvency results in avoidance of ordinary income on the cancellation of indebtedness. Put another way, the argument that income from excess loss accounts should be capital gain because selling the assets of the subsidiary would produce capital gain was thought to lose its validity to the extent the subsidiary is insolvent; with the rationale for capital gain treatment gone the Regulations treat the excess loss account as ordinary income on the premise that the losses of the subsidiary probably were used to offset ordinary income of other members of the group. [F. Peel, *supra*, sec. 16:09, at 47.]

In light of the specific rules under section 1.1502-19, Income Tax Regs., governing the recognition of an excess loss account in taxable income immediately before specified disposition events, and in light of the objectives and policies of those rules, we are hesitant to make (and it would require clear and explicit authority to support) a finding herein that would allow taxpayers to avoid the intended application of those rules.

Petitioners are correct that section 1.1502-19(a)(1), Income Tax Regs.,[9] states that the excess loss account balance shall be computed under the provisions of section 1.1502-32, Income Tax Regs. There is, however, no express statement in those provisions as to how discharge of indebtedness

[9] The text of sec. 1.1502-19(a)(1), Income Tax Regs., is set forth in note 6 *supra*.

income factors into the computation of earnings and profits or the excess loss account. The basis adjustment rules of section 1.1502-32, Income Tax Regs., are detailed and comprehensive. See *Woods Investment Co. v. Commissioner*, 85 T.C. 274, 279, 282 (1985) (Court-reviewed). We do not, however, find therein any specific provisions that would allow discharge of indebtedness income that is not included in taxable income to offset or to eliminate the very recognition of income contemplated by section 1.1502-19, Income Tax Regs. The regulations under section 1.1502-32, Income Tax Regs., do not even mention discharge of indebtedness income, and the only statements therein expressly referring to "excess loss accounts" merely indicate that a net positive adjustment under those regulations shall "reduce [the] excess loss account, if any, with respect to such stock." Sec. 1.1502-32(e)(2), Income Tax Regs.

Petitioners rely heavily on our holding in *Woods Investment Co. v. Commissioner*, *supra*, in which we held that under section 1.1502-32, Income Tax Regs., a subsidiary corporation within an affiliated group of corporations could compute earnings and profits utilizing straight-line depreciation, even though in doing so the subsidiary would benefit from a double deduction because it had utilized an accelerated method of depreciation to compute its taxable income. Our holding in *Woods Investment Co.* was based in large part on section 312(k), which specifically requires a corporation to compute earnings and profits on the basis of straight-line depreciation, regardless of the method of depreciation used to compute the taxable income of the corporation.[10] There exists no comparable statutory provision that requires inclusion of discharge of indebtedness income in earnings and profits in the situation before us and the holding of *Woods Investment Co.* is distinguishable on that basis.

---

[10]Sec. 312(k) provides in part as follows:

SEC. 312(k). EFFECT OF DEPRECIATION ON EARNINGS AND PROFITS.—

(1) GENERAL RULE.—For purposes of computing the earnings and profits of a corporation for any taxable year beginning after June 30, 1972, the allowance for depreciation (and amortization, if any) shall be deemed to be the amount which would be allowable for such year if the straight line method of depreciation had been used for each taxable year beginning after June 30, 1972.

Petitioners argue that certain other authorities support their position, citing Rev. Rul. 75-515, 1975-2 C.B. 117; *Meyer v. Commissioner*, 46 T.C. 65 (1966), affd. in part, vacated in part, and remanded 383 F.2d 883 (8th Cir. 1967); and section 312(l), enacted subsequent to the years in issue by section 5(e)(2) of the Bankruptcy Tax Act of 1980, Pub. L. 96-589, 94 Stat. 3389, 3406. In our view, however, those authorities do not overcome the strong policy against the allowance of double deductions within the context of consolidated income tax returns. We think petitioners' interpretations of the revenue ruling and of our opinion in *Meyer* go too far, and we think that petitioners' interpretation of the relevant changes made by the Bankruptcy Tax Act of 1980 does not go far enough.

In Rev. Rul. 75-515, 1975-2 C.B. 117, and in *Meyer v. Commissioner*, *supra*, the issue was whether discharge of indebtedness income increased a corporation's earnings and profits, even though such income was not included in taxable income due to the taxpayer's insolvency. Of great significance, however, is the fact that the context in which that issue arose in Rev. Rul. 75-515 and in *Meyer* involved the computation of taxable dividends. Neither excess loss accounts nor basis adjustments under the consolidated return provisions were involved.

In holding that earnings and profits were to be increased by nontaxable discharge of indebtedness income in computing taxable dividends, Rev. Rul. 75-515 and our opinion in *Meyer* both produced the result of increasing the tax liabilities in question. That tax effect is quite different from the context in which the issue comes before us in this case. If we allow discharge of indebtedness income to reduce the outstanding balance in the excess loss account before Rome recognizes such balance in income, petitioners' tax liability would decrease. Petitioners would benefit from duplicate or excessive tax losses in that (1) Woods & Copeland's net operating losses in 1976, 1977, and 1978 were used to offset consolidated taxable income in an amount exceeding Rome's basis in Woods & Copeland's stock, (2) Wyman-Gordon was allowed a bad debt deduction in 1978 with respect to the unpaid indebtedness of Woods & Copeland, and (3) Rome would avoid recognizing the excess loss account balance

that had accumulated. See *Bangor & Aroostook Ry. Co. v. Commissioner*, 193 F.2d 827, 831 (1st Cir. 1951), affg. 16 T.C. 578 (1951), an early First Circuit opinion that enunciates a general policy that the computation of earnings and profits should be consistent with the computation of taxable income.

These duplicate or excessive tax losses and deductions arising out of the operations and insolvency of one subsidiary distinguish our holding in *Meyer* and respondent's position in Rev. Rul. 75-515, and justify our adoption of a different rule in the context of the recognition of a corporation's excess loss account. For the same reason, the holding of the Eighth Circuit in *Meyer v. Commissioner*, 383 F.2d 883 (8th Cir. 1967), affg. in part, vacating in part, and remanding 46 T.C. 65 (1966), is distinguishable and provides no particular support for or against our decision herein.

Petitioners also argue that section 312(l), enacted subsequent to the years in issue as part of the Bankruptcy Tax Act of 1980, supports their position. Section 312(l) provides as follows:

(l) DISCHARGE OF INDEBTEDNESS INCOME.—

(1) DOES NOT INCREASE EARNINGS AND PROFITS IF APPLIED TO REDUCE BASIS.—The earnings and profits of a corporation shall not include income from the discharge of indebtedness to the extent of the amount applied to reduce basis under section 1017.

Although the statutory language of section 312(l) is stated only in the negative (i.e., that discharge of indebtedness income will not increase earnings and profits to the extent applied to reduce basis), the legislative history makes it clear that discharge of indebtedness income, including amounts excluded from taxable income due to the debtor's insolvency, will increase earnings and profits (or reduce a deficit in earnings and profits) to the extent the taxpayer's basis in depreciable assets is not reduced.[11]

---

[11]The House report states as follows:

"The bill provides that to the extent that income from discharge of indebtedness (including amounts excluded from gross income pursuant to section 108 of the Code, as amended by this bill) is applied to reduce basis under section 1017 of the Code, such basis-reduction amount does not affect the debtor corporation's earnings and profits (although reduced depreciation deductions or increased gains on sale will affect earnings and profits in the years such deductions are taken or sales made). *Otherwise, discharge of indebtedness income, including*

Petitioners argue that the enactment of section 312(l) represents a codification of Rev. Rul. 75-515 and of our holding in *Meyer*, and that the presence of section 312(l) places this case squarely within our holding in *Woods Investment Co. v. Commissioner, supra.* We disagree. The significance of the addition of section 312(l) to the Code cannot be understood without considering important amendments to section 108 that also were made by the Bankruptcy Tax Act of 1980. That section was significantly rewritten to provide, among other things, that a taxpayer who under new section 312(l) excludes discharge of indebtedness income from taxable income due to insolvency and does not elect to reduce basis in its depreciable assets under section 1017, *must reduce certain other tax attributes.*[12] The first tax attribute to be reduced under section 108 is the debtor's net operating losses. Thus, under amended sections

---

*amounts excluded from gross income (pursuant to section 108 of the Code, as amended by this bill), increases the earnings and profits of the corporation* (or reduces a deficit). [H. Rept. 96-833, at 12, 40 (1980). Emphasis added.]''

Sec. 312(l) is effective, with certain exceptions, to transactions occurring after Sept. 30, 1979. See S. Rept. 96-1035 (1980), 1980-2 C.B. 620, 626.

[12]Sec. 108(b), as amended in 1980, provides as follows:

SEC. 108(b). REDUCTION OF TAX ATTRIBUTES IN TITLE 11 CASE OR INSOLVENCY.—

(1) IN GENERAL.—The amount excluded from gross income under subparagraph (A) or (B) of subsection (a)(1) shall be applied to reduce the tax attributes of the taxpayer as provided in paragraph (2).

(2) TAX ATTRIBUTES AFFECTED; ORDER OF REDUCTION.—Except as provided in paragraph (5), the reduction referred to in paragraph (1) shall be made in the following tax attributes in the following order:

(A) NOL.—Any net operating loss for the taxable year of the discharge, and any net operating loss carryover to such taxable year.

(B) CERTAIN CREDIT CARRYOVERS.—Any carryover to or from the taxable year of the discharge of an amount for purposes of determining the amount of a credit allowable under—

(i) section 38 (relating to investment in certain depreciable property),

(ii) section 40 (relating to expenses of work incentive programs),

(iii) section 44B (relating to credit for employment of certain new employees), or

(iv) section 44E (relating to alcohol used as a fuel).

For purposes of clause (i), there shall not be taken into account any portion of a carryover which is attributable to the employee plan credit (within the meaning of section 48(o)(3)).

(C) CAPITAL LOSS CARRYOVERS.—Any net capital loss for the taxable year of the discharge, and any capital loss carryover to such taxable year under section 1212.

(D) BASIS REDUCTION.—

(i) IN GENERAL.—The basis of the property of the taxpayer.

(ii) CROSS REFERENCE.—

For provisions for making the reduction described in clause (i), see section 1017.

(E) FOREIGN TAX CREDIT CARRYOVERS.—Any carryover to or from the taxable year of the discharge for purposes of determining the amount of the credit allowable under section 27.

108 and 312(l), if these provisions were applicable to petitioners in 1978, Woods & Copeland would be entitled to exclude the $2,038,161 discharge of indebtedness from its taxable income, and it would be entitled to increase its earnings and profits (and thereby reduce its excess loss account) by the amount of the discharge of indebtedness income. However, and particularly significant to our analysis herein, section 108(b) would require Woods & Copeland to reduce its net operating losses, which would increase consolidated taxable income of the affiliated group of corporations, thereby eliminating most of the duplicate deductions or excessive loss characteristics of the instant transaction.[13]

Thus, contrary to petitioners' contention, it is clear that in amending sections 108 and 312(l) in 1980, insofar as applicable to this case, Congress did not merely codify a preexisting rule that nontaxable discharge of indebtedness income is includable in earnings and profits. Rather, and although such a rule was adopted for transactions occurring after the effective date of the 1980 amendments, simultaneously therewith Congress eliminated a significant part of the potential tax mischief inherent in the rule. Without a clear mandate in the Code or regulations requiring a contrary interpretation, we adopt herein an interpretation of the pertinent provisions of sections 1.1502-19 and 1.1502-32, Income Tax Regs., that accomplishes a similar result with regard to years prior to the effective date of the 1980 legislation.

The addition of section 312(l) to the Code in 1980, together with the amendments to section 108, also provide further support for our conclusion herein that the situation before us is significantly different from the facts of *Woods*

[13]If the 1978 operating losses of Woods & Copeland that would be reduced under sec. 108(b) (if that section were in effect for 1978) were less than the discharge of indebtedness income included in earnings and profits, sec. 108(b) would then require adjustments to Woods & Copeland's claimed general business credits under sec. 38, to its claimed capital loss carryover under sec. 1212, to the basis in its property (or to the basis of that property in the hands of Wyman-Gordon as the transferee thereof), or to its foreign tax credit carryovers. Sec. 108(b). Obviously, Woods & Copeland's discharge of indebtedness income would increase its earnings and profits without a corresponding effect on Woods & Copeland's other tax attributes to the extent the discharge of indebtedness income exceeds the tax attributes to be adjusted under sec. 108(b). In our general discussion herein of the relevant provisions of the bankruptcy Tax Act of 1980, we have disregarded the effect of certain transition rules provided in that statute. See sec. 7(a)(2) of the Bankruptcy Tax Act of 1980, Pub. L. 96-589, 94 Stat. 3389.

*Investment Co. v. Commissioner, supra.* When the provision analogous to section 312(k) was added to the Code (namely, sec. 312(l)), Congress simultaneously amended section 108 and by those amendments avoided the tax consequences that otherwise would have obtained under an analysis similar to that set forth in *Woods Investment Co.*

In conclusion, we note that section 1.1016-6(a), Income Tax Regs., provides that "adjustments [to basis] must always be made to eliminate double deductions or their equivalent."[14] In the context of an issue under that regulation and under section 1.1502-34, Income Tax Regs., it was stated—

The argument that a general provision of law (Section 1.1016-6(a)) must always give way to a specific provision (Section 1.1502-34) dealing with the same subject matter is not applicable here since there is no specific provision in Section 34 which provides for a double deduction. * * * [*Associated Telephone & Telegraph Co. v. United States*, 199 F. Supp. 452, 477 (S.D. N.Y. 1961), revd. on another issue 306 F.2d 824 (2d Cir. 1962), cert. denied 371 U.S. 950 (1963).]

Similarily, we find herein no specific provision in section 1.1502-32, Income Tax Regs., or elsewhere in the Code or applicable regulations, that would justify a holding herein allowing petitioners to increase Woods & Copeland's earnings and profits by the nontaxable discharge of indebtedness income and thereby to avoid including in income the balance of Rome's excess loss account.

For the reasons stated above,

*Decision will be entered for the respondent.*

---

[14]Sec. 1.1016-6(a), Income Tax Regs., provides—

Sec. 1.1016-6. Other applicable rules.

(a) Adjustments must always be made to eliminate double deductions or their equivalent. Thus, in the case of the stock of a subsidiary company, the basis thereof must be properly adjusted for the amount of the subsidiary company's losses for the years in which consolidated returns were made.