WALT DISNEY INCORPORATED AS SUCCESSOR IN INTEREST TO RETLAW ENTERPRISES, INC. AND SUBSIDIARY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 35695-87.　　　Filed August 5, 1991.

*James G. Phillipp, Stephen L. Tolles,* and *Sally A. James,* for the petitioner.

*Richard H. Gannon,* for the respondent.

## OPINION

FEATHERSTON, *Judge:* Respondent determined a deficiency in the amount of $453,197 in the Federal income tax of Retlaw Enterprises, Inc. (Retlaw), of which Walt Disney Inc. (petitioner) is a successor in interest. The only issue remaining for decision is whether Retlaw is required to recapture investment tax credit for 1982 in an amount of $483,918 as a result of the transfer of certain assets to a newly formed subsidiary corporation.

All the facts are stipulated.

## *Background*

Petitioner's principal office was located in Burbank, California, at the time its petition was filed.

During the relevant period, Walt Disney Productions (Productions), later known as Walt Disney Co., was a California corporation engaged primarily in the production of motion pictures and television films, and in the operation of Disneyland in California and Walt Disney World in Florida. Its stock was publicly held.

Retlaw was a California corporation which, at all relevant times prior to December 1, 1981, had the following main businesses and assets (exclusive of cash and receivables):

(a) The commercial rights to the name "Walt Disney," conveyed to Retlaw by Walter E. Disney prior to his death and licensed to Productions for its use in connection with its various business ventures;

(b) two "rides" or "attractions" at Disneyland, specifically the miniature railroad and the monorail system, both of which were owned and operated by Retlaw through its own employees on rights-of-way leased by Retlaw from Productions;

(c) two television broadcasting stations;

(d) a cattle ranch of approximately 14,000 acres; and

(e) various agricultural properties.

Retlaw's outstanding stock, which was all common stock, was owned during the taxable year in issue by the widow of Walter E. Disney, the Disneys' two daughters, and trusts for the benefit of two Disney grandchildren. Prior to January 28, 1982, Retlaw's taxable year was a 52-53 week year ending on the Saturday closest to the last day of March.

Sometime prior to April 9, 1980, Productions and Retlaw opened negotiations for Productions to acquire from Retlaw items (a) and (b), listed above, referred to herein as the "Disney assets." Productions did not wish to acquire items (c), (d), and (e) above, or cash and receivables, all of which are referred to herein as the "non-Disney assets." As a means of effecting the acquisition, Productions was willing to acquire the Disney assets directly or to acquire them indirectly by purchasing Retlaw's stock.

On June 29, 1981, after extensive negotiations between Retlaw and Productions, the Productions board of directors approved the Retlaw Acquisition Agreement (acquisition agreement). On July 8, 1981, Productions and the shareholders of Retlaw entered into the acquisition agreement. Under the terms of the acquisition agreement, Productions agreed, subject to certain conditions, to acquire all of the outstanding common stock of Retlaw in exchange for $46.2 million worth of Productions common stock. The exact number of Productions shares was to be determined by reference to the average closing price of Productions stock on the New York Stock Exchange during a specified period immediately preceding the closing date of the transaction. The closing

date was to be not later than 30 days after the Productions shareholders approved the acquisition agreement.

Among the conditions precedent specified in the acquisition agreement were the following:

(1) On or before the closing date, Retlaw would transfer to a wholly owned subsidiary all of the Retlaw liabilities and non-Disney assets, and would distribute the stock of the wholly owned subsidiary to the Retlaw shareholders;

(2) the acquisition agreement would be approved on or before the closing date by a vote of the Productions shareholders owning a majority of the Productions common shares voting on the matter (exclusive of the shareholders of Productions who were also shareholders of Retlaw, and certain related persons);

(3) there would be no court order in effect on the closing date restraining or enjoining the acquisition by Productions of the Retlaw common stock; and

(4) all of the representations and warranties of the Retlaw shareholders contained in the acquisition agreement would be true as of the closing date.

Productions could waive the conditions contained in the acquisition agreement, including those listed above.

On or about July 1, 1981, Retlaw and Productions through their respective attorneys requested a ruling from the Internal Revenue Service (IRS) concerning the income tax consequences of the proposed transactions. The request was approved on October 22, 1981, with the IRS concluding that: (1) The exchange of Retlaw assets for all the stock of a newly formed corporation, followed by the distribution of the stock to the Retlaw shareholders, would be a reorganization within the meaning of section 368(a)(1)(D);[1] and (2) the subsequent exchange of all the Retlaw stock for Productions stock would be a reorganization within the meaning of section 368(a)(1)(B).

On December 1, 1981, Retlaw transferred to the 1333 Flower Street Co., Inc. (Flower Street), a newly created California corporation, all of the non-Disney assets in exchange for 4,500 shares of Flower Street's authorized but unissued common stock. Retlaw had previously claimed

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code of 1954 as amended. Rule references are to the Tax Court Rules of Practice and Procedure.

investment tax credits under section 38 on certain of these transferred non-Disney assets. Retlaw took no formal action, as evidenced by shareholder or board resolutions, contemplating the liquidation of Flower Street in the event the acquisition of Retlaw by Productions failed to occur.

On December 18, 1981, Productions commenced the solicitation of shareholder proxies for a meeting on January 28, 1982, which meeting had been scheduled earlier for the purpose, among others, of approving or rejecting the acquisition agreement. On January 28, 1982, the shareholders of Productions approved the acquisition of the Retlaw stock by an affirmative vote of 93 percent of the common shares voted.

On January 28, 1982, immediately following the meeting of its shareholders, Productions proceeded to acquire all of the outstanding stock of Retlaw on the terms set forth in the acquisition agreement. Productions transferred to the Retlaw shareholders $46.2 million worth of Productions common stock valued pursuant to the agreed formula. The Retlaw shareholders transferred to Productions all of the outstanding common stock of Retlaw.

On the same day as and immediately before Productions acquired all of the common stock of Retlaw, Retlaw distributed to its own shareholders, pro rata with respect to their stock in Retlaw, all of the common stock of Flower Street theretofore owned by Retlaw. Both Retlaw (currently known as Disney Inc.)[2] and Flower Street (currently known as Retlaw Enterprises, Inc.) remained in existence as operating entities through the date of the stipulation of facts filed in this proceeding.

Prior to the closing of the acquisition, on January 25, 1982, certain Productions shareholders instituted a shareholders' derivative suit seeking a permanent injunction and alleging that the price of the Retlaw stock called for in the acquisition agreement was too high. As of the closing date, no temporary restraining order was in effect and the suit did not impede the closing. The suit was finally settled in October of 1983 under an agreement whereby the number of Productions shares transferred to the Retlaw shareholders

---

[2]Between Retlaw Enterprises, Inc., and Disney Inc., the name of the corporation was Walt Disney Incorporated, the name that appears on the notice of deficiency and the petition.

on the closing date was adjusted downward by about 8 percent, or 70,000 shares.

For its short taxable year ended January 28, 1982, Retlaw, as the common parent of an affiliated group, elected to file a consolidated Federal income tax return with Flower Street. The consolidated return included the income and deductions of Retlaw for the period March 29, 1981, through January 28, 1982, and the income and deductions of Flower Street for the period December 1, 1981, through January 28, 1982. The parties have stipulated that Retlaw and Flower Street were entitled to file a consolidated return for the short taxable year ended January 28, 1982, and made a valid election to do so.

By reason of the acquisition of the Retlaw common stock by Productions, Retlaw on January 28, 1982, became a member of an affiliated group of which Productions was the common parent and which had previously elected to file its Federal income tax returns on a consolidated basis.

## Discussion

Respondent determined that Retlaw is required under section 47 to recapture investment tax credits of $483,918 with respect to section 38 property as a result of the transfer of assets to Flower Street on December 1, 1981. To support this determination, respondent refers to section 47(a)(1), which provides that if during the taxable year any property is disposed of or otherwise ceases to be section 38 property with respect to the taxpayer before the close of the useful life taken into account in computing the section 38 credit, the tax for such taxable year shall be increased.

The parties have stipulated, however, that Retlaw and Flower Street were entitled to, and did, file a consolidated return for the taxable period ended January 28, 1982, during which Retlaw transferred the section 38 property to Flower Street. Section 1502 authorizes the issuance of regulations on the filing of consolidated returns. Section 1.1502-3(f)(2)(i), Income Tax Regs., with exceptions not here applicable, provides in pertinent part as follows:

a transfer of section 38 property from one member of the group to another member of such group during a consolidated return year shall not be treated as a disposition or cessation within the meaning of section

47(a)(1). If such section 38 property is disposed of, or otherwise ceases to be section 38 property * * * with respect to the transferee, before the close of the estimated useful life which was taken into account in computing qualified investment, then section 47(a)(1) or (2) shall apply to the transferee with respect to such property (determined by taking into account the period of use, qualified investment, other dispositions, etc., of the transferor). Any increase in tax due to the application of section 47(a)(1) or (2) shall be added to the tax liability of such transferee (or the tax liability of a group, if the transferee joins in the filing of a consolidated return).

The intent of the regulation is explained in examples given in section 1.1502-3(f)(3), Income Tax Regs., as follows:

*Example (1).* P, S, and T file a consolidated return for calendar year 1967. In such year S places in service section 38 property having an estimated useful life of more than 8 years. In 1968, P, S, and T file a consolidated return, and in such year S sells such property to T. Such sale will not cause section 47(a)(1) to apply.

*Example (2).* Assume the same facts as in example (1), except that P, S, and T filed separate returns for 1967. The sale from S to T will not cause section 47(a)(1) to apply.

*Example (3).* Assume the same facts as in example (1), except that P, S, and T continue to file consolidated returns through 1971 and in such year T disposes of the property to individual A. Section 47(a)(1) will apply to the group * * *

\*        \*        \*        \*        \*        \*        \*

*Example (5).* Assume the same facts as in example (1), except that in 1969, P sells all the stock of T to a third party. Such sale will not cause section 47(a)(1) to apply.

Petitioner maintains that these provisions explicitly deny the investment tax credit recapture respondent here seeks.

The parties agree that the circumstances before us fall within the literal terms of section 1.1502-3(f)(2) and (3), Income Tax Regs. As required by section 1.1502-3(f)(2)(i), Income Tax Regs., the transfer of section 38 assets from Retlaw to Flower Street was between members of an affiliated group. Example (2) illustrates that Retlaw could have permissibly placed the subject property in service in a year for which it and Flower Street did not file a consolidated return. Examples (3) and (5) taken together illustrate that the recapture triggering event is disposition of the property by Flower Street, not the transfer of the Flower Street stock out of the affiliated group. Nonetheless, respondent argues that the regulation is premised on the

assumption that the section 38 property is to remain in the affiliated group. In the light of the acquisition agreement, asserts respondent, there was no intention at the time of Retlaw's transfer of the property to Flower Street to keep the property within the affiliated group.

Although the example (5) stock sale occurs in the year following the sale of the property within the affiliated group, there is nothing in section 1.1502-3(f)(2)(i) and (3), Income Tax Regs., requiring a minimum waiting period. Indeed, as little as a 1-day wait would be literally consistent with the examples in the regulation: the sale from S to T in example (1) could occur on December 31, 1968, and the sale of the S stock out of the affiliated group in example (5) could occur on January 1, 1969. Nor is there any express requirement that the idea for the stock transfer arise after the sale of the property within the affiliated group. Thus, respondent's contention that the regulation is premised on the property remaining in the affiliated group is not apparent from the regulation itself.

Congress long ago delegated to the Secretary of the Treasury the authority to prescribe regulations relating to an affiliated group of corporations making a consolidated return. Sec. 1502. When the authority to prescribe legislative regulations exists, this Court is not inclined to interfere if the regulations as written support the taxpayer's position. *Transco Exploration Co. v. Commissioner,* 95 T.C. 373, 383-384 (1990); *Idaho First National Bank v. Commissioner,* 95 T.C. 185 (1990).

In *Woods Investment Co. v. Commissioner,* 85 T.C. 274 (1985), the taxpayer had four wholly owned subsidiaries with which it filed consolidated returns. The taxpayer sold the stock of all four in 1978 and, in computing its basis for determining gain, relied upon Code section 312(k) and section 1.1502-32(b), Income Tax Regs. Although the subsidiaries had computed their annual taxable income using accelerated depreciation, section 312(k) required that the earnings and profits computation incorporate straight-line depreciation. In accordance with section 1.1502-32(b), Income Tax Regs., the taxpayer had adjusted its basis in the stock of each of the subsidiaries to reflect changes in the subsidiary's earnings and profits account for each consoli-

dated return year. The excess of depreciation actually claimed over straight-line was not reflected in the basis adjustments of the taxpayer, which therefore computed a correspondingly smaller amount of gain.

Despite the apparent unwarranted benefit to the taxpayer, this Court adopted the reasoning of an earlier case in which respondent had argued unsuccessfully for a result not expressed in the applicable regulations:

we conclude that * * * [the taxpayer] reached the result mandated by respondent's consolidated return regulations and section 312(k) in computing its basis in the subsidiaries' stock. We believe that judicial interference sought by respondent is not warranted to alter this result. This Court will apply these regulations and the statute as written. * * *

If respondent believes that his regulations and section 312(k) together cause * * * [the taxpayer] to receive a "double deduction," then respondent should use his broad power to amend his regulations. See *Henry C. Beck Builders, Inc. v. Commissioner*, 41 T.C. 616, 628 (1964). Since respondent has not taken steps to amend his regulations, we believe his apparent reluctance to use his broad power in this area does not justify judicial interference in what is essentially a legislative and administrative matter. *Henry C. Beck Builders, Inc. v. Commissioner*, *supra* (Drennen, J., concurring at page 633).

[*Woods Investment Co. v. Commissioner, supra* at 281-282.]

This Court distinguished *Woods Investment* in *Wyman-Gordon Co. v. Commissioner*, 89 T.C. 207 (1987), and respondent asserts that the case before us is similarly distinguishable. In *Wyman-Gordon*, the parent corporation canceled a debt owed to it by an insolvent second-tier subsidiary and claimed a bad debt loss. Because of its insolvency, the subsidiary did not include a discharge-of-indebtedness amount in its taxable income, but did increase its earnings and profits by this amount. The increase in earnings and profits eliminated the intermediate first-tier subsidiary's excess loss account, the balance of which ordinarily becomes income upon a triggering disposition event. Sec. 1.1502-19(a)(1), Income Tax Regs. The realization of discharge-of-indebtedness income by an insolvent subsidiary is such a disposition event. Sec. 1.1502-19(b)(2)(iii), Income Tax Regs.

This Court held that the insolvent second-tier subsidiary was not entitled to increase its earnings and profits by the nontaxable discharge-of-indebtedness income and thereby

prevent the taking into income of the first-tier subsidiary's excess loss account. In so doing, the Court explained that the apparent double benefit sought by the taxpayers, in terms of excessive tax losses, was not supported by either the statute or the regulations. 89 T.C. at 224. *Woods Investment* was distinguished on the basis of the taxpayer's adherence in that case to section 312(k). 89 T.C. at 219.

Respondent contends here that, as in *Wyman-Gordon,* there is no statutory or regulatory provision that supports petitioner. As already noted, however, section 1.1502-3(f)(2)(i), Income Tax Regs., which is clearly intended to be a taxpayer-favorable provision, by its literal terms encompasses petitioner's situation. *Wyman-Gordon* is, accordingly, not on point.

Section 47(b), like section 1.1502-3(f)(2)(i), Income Tax Regs., contains an exception to the recapture otherwise required by section 47(a)(1). Specifically, section 47(b) allows for section 38 property to be disposed of "by reason of a mere change in the form of conducting the trade or business so long as the property is retained in such trade or business as section 38 property and the taxpayer retains a substantial interest in such trade or business." Section 1.47-3(f)(1)(ii)*(b)* and (5)(ii), Income Tax Regs., expands on the "so long as" language in the statute by requiring a recapture determination when the transferor no longer retains a substantial interest in the trade or business.

Petitioner does not contend that the circumstances in this case fall within the exception of section 47(b). We address the provision, however, because respondent throughout his opening brief attempts to steer us in that direction. Respondent sets the stage early by informing us that he has "consistently ruled that the transfer of property in connection with a corporate division is subject to recapture where the taxpayer placing the property in service fails to retain a substantial interest in the transferee after the integrated transaction comes to rest. More importantly, recapture is mandated by" the section 47 regulations. Respondent summarizes the instant case shortly thereafter: "Viewed as a whole, the transaction in question constituted a transfer of * * * [section] 38 property to a new subsidiary, followed by a termination of the transferor's

interest in the new subsidiary, a transaction clearly mandating the recapture of investment tax credit." Respondent asks us, in effect, to require recapture in this case because, after the distribution of Flower Street stock to the Retlaw shareholders, Retlaw no longer had a substantial interest in the transferred assets.

We reject respondent's attempt to divert our attention from the consolidated return regulation to the "substantial interest" principle of section 47(b).[3] The two exceptions to recapture (section 1.1502-3(f)(2), Income Tax Regs., and section 47(b)) are not interdependent, and they differ in major respects. For example, while section 1.47-3(f)(1)(ii)*(c)*, Income Tax Regs., requires that the change in form cover substantially all the assets necessary to operate the trade or business, section 1.1502-3(f)(2)(i), Income Tax Regs., applies to the transfer of "section 38 property" not necessarily comprising a trade or business. Furthermore, an ongoing "substantial interest" requirement is clearly inconsistent with the consolidated return regulation. Section 1.1502-3(f)(2)(i), Income Tax Regs., requires only a transfer from "one member of the group to another member of such group." This provision by its terms includes, and quite obviously is meant to include, transfers in which the transferor relinquishes a substantial interest in the section 38 property immediately, such as a transfer between brother and sister corporations or from subsidiary to parent.

With regard to the consolidated return regulations, respondent does not limit his argument to section 1.1502-3(f)(2) and (3), Income Tax Regs. Respondent's primary position, in fact, derives from the step transaction doctrine, which, according to respondent, is part of the "other law" referred to in section 1.1502-80, Income Tax Regs.:

The Code, or other law, shall be applicable to the group to the extent the regulations do not exclude its application. Thus, for example, in a transaction to which section 381(a) applies, the acquiring corporation will

[3]Respondent focuses on sec. 47(b) presumably because the corresponding regulations have a self-contained recapture triggering event, the termination of a substantial interest, that occurred in the instant case. The recapture triggering event under the literal terms of sec. 1.1502-3(f)(2)(i) and (3), Income Tax Regs., which would be Flower Street's disposition of the assets, has not occurred.

succeed to the tax attributes described in section 381(c). Furthermore, sections 269, 304, and 482 apply for any consolidated return year.

Respondent argues that the present circumstances meet all three of the formulations of the step transaction doctrine discussed in *Penrod v. Commissioner,* 88 T.C. 1415, 1428-1430 (1987): The "binding commitment" test, the "end result" test, and the "interdependence" test. According to respondent, the transfer of the non-Disney assets from Retlaw to Flower Street on December 1, 1981, and the distribution of the Flower Street stock to the Retlaw shareholders on January 28, 1982, should be treated as integral parts of the same transaction. More specifically, respondent asserts that the acquisition agreement was the "binding commitment" that mandated both steps, that the first step was intended to help accomplish the joint "end result" of the second step and the exchange of the Retlaw stock for Productions stock, and that the two steps were "interdependent" in that the first would not have been undertaken absent an intent or purpose to undertake the second.

However invoked, the step transaction doctrine combines individually meaningless steps into a single transaction. *Esmark, Inc. & Affiliated Cos. v. Commissioner,* 90 T.C. 171, 195 (1988), affd. without published opinion 886 F.2d 1318 (7th Cir. 1989). Respondent here characterizes the step transaction doctrine similarly, as ignoring the tax effects of intermediate steps in an integrated transaction in order to focus on the whole. In addition, respondent has published his position as to when the step transaction doctrine will not apply:

The step transaction doctrine generally permits a series of formally separate steps to be amalgamated and treated as a single transaction if they are in substance integrated, interdependent, and focused toward a particular end result. The Internal Revenue Service has indicated on several occasions that threshold steps will not be disregarded under a step transaction analysis if such preliminary activity results in a permanent alteration of a previous bona fide business relationship. Thus, the substance of each of a series of steps will be recognized and the step transaction doctrine will not apply, if each such step demonstrates independent economic significance, is not subject to attack as a sham, and was undertaken for valid business purposes and not mere avoidance of taxes. [Rev. Rul. 79-250, 1979-2 C.B. 156, 157; citations omitted.]

Respondent here gives credence to each step in the instant case by blessing the reorganization plan and by approving the Retlaw-Flower Street consolidated return for the period ended January 28, 1982. Respondent's difficulty, then, as a general matter, is that he "has pointed to no meaningless or unnecessary steps that should be ignored." *Esmark, Inc. & Affiliated Cos. v. Commissioner, supra* at 195. We consider three specific events in this regard. Respondent consistently refers to two in articulating his step transaction position: the non-Disney asset transfer to Flower Street on December 1, 1981, and the distribution of Flower Street stock on January 28, 1982. The third is the other half of the December 1, 1981, exchange: the issuance of Flower Street stock to Retlaw.

Regarding the transfer of the non-Disney assets from Retlaw to Flower Street, respondent has understandably avoided urging us to ignore the tax effects of this event. Section 47(a)(1), which serves as the foundation for respondent's recapture position, applies to property that "is disposed of, or otherwise ceases to be section 38 property with respect to the taxpayer." Respondent presumably must respect the transfer of the non-Disney assets in order to have a disposition event that triggers section 47(a)(1) recapture.

Respondent also does not maintain that the stock transfer from Flower Street to Retlaw on December 1, 1981, should be ignored as meaningless. The parties have stipulated that Retlaw and Flower Street were entitled to, and did, file a consolidated return for the taxable period ended January 28, 1982, including the income and deductions of Flower Street beginning on December 1, 1981. The stock transfer was the event that created the affiliated group.

Finally, respondent does not ask us specifically to ignore the distribution of the Flower Street stock to the Retlaw shareholders on January 28, 1982. Respondent needs this break in affiliation between Retlaw and Flower Street to set up the objectionable conflict with the alleged unstated premise of section 1.1502-3(f)(2) and (3), Income Tax Regs., which premise is that the section 38 property will remain within the affiliated group.

Even apart from the shortcomings inherent in respondent's necessarily vague articulation of the step transaction doctrine in the instant case, we believe the record is sufficient to establish the independent significance of the steps questioned by respondent. For example, even without the subsequent distribution of the Flower Street stock, the exchange transaction on December 1, 1981, could have stood on its own as a valid business maneuver in that it separated the non-Disney assets (recorded on the books at several million dollars) from the Disney assets. In fact, Retlaw took no formal action contemplating the liquidation of Flower Street in the event the acquisition of Retlaw by Productions failed to occur. Flower Street, now known as Retlaw Enterprises, Inc., remains in existence as an operating entity.

The facts here that relate to the structure of the overall transaction are similar to those this Court considered in *Tandy Corp. v. Commissioner*, 92 T.C. 1165 (1989). There, the taxpayer decided in its fiscal year 1975 to incorporate two new entities to which it would transfer the assets and liabilities relating to two separate business operations in exchange for all the stock of the new corporations, and then to distribute that stock to its shareholders. The exchange transaction, which included section 38 property with unexpired useful lives for purposes of the previously claimed investment tax credit, occurred on the last day of the taxpayer's fiscal year 1975. Months later the taxpayer distributed to its shareholders the stock of the new corporations, an action that would not have been taken without the receipt of a favorable letter ruling from the IRS and also Securities and Exchange Commission approval of an effective registration statement.

The taxpayer in *Tandy* argued that section 47(a)(1) did not require recapture in 1975 based on the mere-change-in-form exception contained in section 47(b).[4] Respondent argued that the incorporation of the two new entities and the subsequent distribution of their stock to the taxpayer's shareholders were parts of an integrated corporate division

---

[4]Although both *Tandy Corp. v. Commissioner*, 92 T.C. 1165 (1989), and this case involve sec. 47(a)(1) recapture, that similarity is merely coincidental. We noted earlier that the sec. 47(b) exception, which *Tandy* addresses, is not at issue in this case.

pursuant to section 368(a)(1)(D), and that the taxpayer's "substantial interest" therefore ended at the time of the exchange in fiscal year 1975.

This Court held for the taxpayer on the ground that both parts of the section 368(a)(1)(D) reorganization should be separately respected rather than collapsed:

> None of the steps in this transaction were meaningless or unnecessary. Indeed, respondent does not seriously dispute that the reorganization was undertaken for valid business reasons. Rather, the transaction before us is a textbook "D" reorganization to which respondent gave his seal of approval in the letter ruling of September 30, 1975. Both the transfer in the year before the Court and the distribution in a later year were critical to achieve the desired result. However, the distribution to the shareholders of the stock of the subsidiaries was not essential to separation of the three components of * * * [the taxpayer's] business. * * *
> * * * Where a particular step has an independent tax consequence, as is the case here, that step is given its tax consequence in the particular year in which it takes place. The transfer of assets and distribution of stock each had independent substance. Delay of the stock distribution until 1976 was neither meaningless nor occasioned solely to achieve a specific tax result. Each step must, therefore, be treated as occurring when it actually did occur. We hold that when a taxpayer adheres strictly to the requirements of a statute intended to confer tax benefits, whether or not steps in an integrated transaction, when the result of the steps is what is intended by the parties and fits within the particular statute, and when each of the several steps and the timing thereof has economic substance and is motivated by valid business purposes, the steps shall be given effect according to their respective terms. * * *
> [*Tandy Corp. v. Commissioner, supra* at 1172-1173.]

The similarities between *Tandy* and the instant case are readily apparent. Retlaw and Productions requested and obtained a ruling from the IRS that the two steps respondent now seeks to collapse constituted a reorganization within the meaning of section 368(a)(1)(D). Respondent was presumably satisfied at that time with the stated business purpose, which was to facilitate the acquisition by Productions of certain desired Retlaw assets relating to the operations of Productions. Neither the notice of deficiency nor respondent's briefs suggest that respondent now has a different view about the validity of the section 368(a)(1)(D) reorganization.

In addition, both *Tandy* and this case involve contingencies that explain the delay between the two steps, and significant contingencies are not easily reconciled with the

step transaction doctrine. See, e.g., *Dunlap & Associates, Inc. v. Commissioner,* 47 T.C. 542 (1967); *Scientific Instrument Co. v. Commissioner,* 17 T.C. 1253 (1952), affd. 202 F.2d 155 (6th Cir. 1953). The taxpayer in *Tandy* awaited both IRS and Securities and Exchange Commission approval. The Retlaw shareholders awaited, among other things, approval of the acquisition agreement by the Productions shareholders and assurance that no court order would interfere with consummation of the overall transaction on the closing date.

Respondent downplays the significance of *Tandy* on the ground that it deals with a timing issue. We face no such timing issue in the instant case, according to respondent, because both the transfer of non-Disney assets to Flower Street and the distribution of Flower Street stock occurred in the same taxable year. By seeking to collapse events that occurred nearly 2 months apart, however, respondent has at least indirectly called timing into question. The *Tandy* reasoning is no less appropriate here merely because a change in taxable years did not intervene.

Because respondent has not enlightened us as to any meaningless or unnecessary step and we have failed to discern one, what appears to remain of his step transaction position is that on December 1, 1981, there already existed an overall plan to transfer the section 38 assets out of the affiliated group by means of steps in an integrated transaction. Despite the accuracy of that characterization, overall plans and integrated transactions do not, without more, justify application of the step transaction doctrine. *Tandy Corp. v. Commissioner, supra* at 1171-1173; *Esmark, Inc. & Affiliated Cos. v. Commissioner, supra* at 195; see *Grove v. Commissioner,* 490 F.2d 241, 247-248 (2d Cir. 1973), affg. a Memorandum Opinion of this Court ("foresight and planning do not transform a non-taxable event into one that is taxable"). We hold for petitioner.

To reflect the foregoing and concessions,

*Decision will be entered under Rule 155.*