CSI HYDROSTATIC TESTERS, INC., AND SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 26350–91.          Filed August 30, 1994.

*Steven I. Klein* and *Susan Whittington Leidner,* for petitioners.

*Linda K. West, Louis John Zeller, Jr., Alfred C. Bishop, Jr.,* and *Richard L. Osborne,* for respondent.

OPINION

WELLS, *Judge:* Respondent determined a deficiency in petitioners' Federal income tax for their taxable year ended May 31, 1987, in the amount of $1,513,943.[1] The issues for decision are: (1) Whether cancellation of indebtedness (COD) income that was excluded from the taxable income of a subsidiary corporation, under section 108(a),[2] should be

---

[1] At trial, respondent conceded that the correct amount of the deficiency was $684,482. Respondent now states that the concession made at trial was erroneous, but in the event respondent prevails in the instant case, the deficiency will remain $684,482. Because we hold for petitioners, the point is academic.

[2] Unless otherwise indicated, all section and Code references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice

included in the subsidiary's earnings and profits for purposes of computing the excess loss account of its parent corporation under section 1.1502–19, Income Tax Regs.; or, alternatively, (2) whether, for purposes of the investment basis adjustment rules of section 1.1502–32(b), Income Tax Regs., the amount of COD income included in the subsidiary's earnings and profits is limited in amount to the tax attributes the subsidiary reduced pursuant to section 108(b)(2)(A) and, if so, whether the subsidiary's net operating loss carryovers, which were reduced under section 108(b)(2)(A), should be treated as "absorbed" for purposes of section 1.1502–32(b)(2)(ii), Income Tax Regs.

## Background

Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91. The stipulations are incorporated in this opinion by this reference. Petitioners are corporations whose principal offices were located in Lafayette, Louisiana, at the time the petition in the instant case was filed. Petitioners are CSI Hydrostatic Testers, Inc. (CSI), Sea Level International, Inc. (Sea Level), and CSI Blasters Painters, Inc. (CSI Blasters). During petitioners' taxable year ended May 31, 1987, CSI owned 80 percent of the outstanding stock of Sea Level[3] and 100 percent of the outstanding stock of CSI Blasters. CSI, Sea Level, and CSI Blasters were members of an affiliated group of corporations that elected to file consolidated Federal income tax returns beginning with their taxable year ended May 31, 1981.

CSI's principal business is the hydrostatic testing of cross-country pipelines. CSI tests a pipeline by filling it with water at a pressure of 2.5 times the pipeline's working pressure. CSI then inspects the pipeline for weak joints and other signs of potential failure. In order to expand its hydrostatic testing business, CSI became involved in marine testing, which involves the hydrostatic testing of pipeline located below the surface of the water. Marine testing, before CSI entered the business, was usually conducted with large working barges that are expensive to operate. CSI, however, discovered that

and Procedure.

[3] The remaining 20 percent of the outstanding stock of Sea Level was owned by Richard Hargett, who is the brother of the two principal shareholders of CSI.

it was more efficient and less expensive to conduct marine testing with smaller four-point mooring vessels.

CSI was successful in using four-point mooring vessels to conduct marine testing. CSI, through its 80-percent owned subsidiary, Sea Level, chartered the four-point mooring vessels that CSI used in its marine testing operations. Due to its success with marine testing, Sea Level decided to charter the construction of two state-of-the-art four-point mooring vessels. Sea Level took possession of the two four-point mooring vessels, the M/V *Sea Level 7* and the M/V *Sea Level 27* (the vessels), during 1981. During 1983, Sea Level experienced a considerable decline in its business brought about by the sharp decline in oil prices on the world market and the corresponding reduction in the search for domestic oil and gas sources. During 1985, Sea Level filed a petition under chapter 11 of the Bankruptcy Code.[4] Sea Level originally planned to reorganize under the protection of the bankruptcy court pursuant to chapter 11. Because of the severely depressed state of the oil and gas industry, however, Sea Level was ultimately forced to adopt a plan of liquidation under chapter 11.

Pursuant to its plan of liquidation, Sea Level's assets were either transferred directly to Sea Level's creditors, or they were sold by the trustee of the bankruptcy estate and the proceeds were distributed to Sea Level's creditors. In connection with Sea Level's plan of liquidation, the vessels were transferred to the creditor holding preferred ship mortgages secured by the vessels. The vessels had a fair market value of $2,200,000 on the date of transfer to the secured creditor. During its taxable year ended May 31, 1987, Sea Level, pursuant to an order of the bankruptcy court, was discharged from $4,321,245 of the debt that remained outstanding after the liquidation of its assets. For taxable year ended May 31, 1987, Sea Level excluded from its taxable income the $4,321,245 of discharged debt pursuant to section 108(a) (hereinafter the COD income).

As of June 1, 1986 (the beginning of petitioners' taxable year ended May 31, 1987), CSI had an investment basis in Sea Level's stock in the amount of $601,987. The following

---

[4] See *In re Sea Level Intl., Inc.,* No. 485–007711–LO (W.D. La.).

figures relate to the computation of CSI's investment basis in its Sea Level stock for the taxable year ended May 31, 1987:

| | |
|---|---:|
| Taxable income (per return) of Sea Level for taxable year ended May 31, 1987 | $2,024,471 |
| Gain of Sea Level (for purposes of income tax computation) on the transfer of M/V *Sea Level 7* | 1,054,857 |
| Gain of Sea Level (for purposes of income tax computation) on the transfer of M/V *Sea Level 27* | 1,066,667 |
| Loss of Sea Level (for purposes of earnings and profits computation) on transfer of M/V *Sea Level 7* | (1,126,611) |
| Loss of Sea Level (for purposes of earnings and profits computation) on transfer of M/V *Sea Level 27* | (1,172,387) |
| Tier adjustment—Sea Level of U.K. | [1](8,242) |
| Cancellation of debt income of Sea Level | 4,321,245 |
| Sea Level's sec. 108(b) reduction of tax attributes (effective June 1, 1987): | |
|     Net operating losses (NOL's) | 1,286,013 |
|     Investment tax credit (ITC) | 751,840 |
|     Reduction of basis of assets | 1,531 |
| Consolidated NOL's attributable to Sea Level as of June 1, 1986, not used as a deduction in consolidated return in any taxable year from taxable year ended May 31, 1983, through taxable year ended May 31, 1986 | [2]2,953,644 |
| Consolidated NOL's attributable to Sea Level used as a deduction in consolidated return for taxable year ended May 31, 1987, from: | |
|     Taxable year ended May 31, 1983 | [2]97,732 |
|     Taxable year ended May 31, 1984 | [2]1,829,218 |
| Consolidated NOL's attributable to Sea Level for taxable year ended May 31, 1984, taxable year ended May 31, 1985, and taxable year ended May 31, 1986, not used as a deduction for taxable year ended May 31, 1987 | [2]1,028,810 |

[1] 100 percent figure.
[2] Represents 80 percent of Sea Level's NOL.

## *Discussion*

In the instant case, Sea Level, for its taxable year ended May 31, 1987, included the COD income in its earnings and profits pursuant to section 312(l), and CSI adjusted its investment basis in its Sea Level stock to reflect the increase in Sea Level's earnings and profits. Consequently, CSI's investment basis in its Sea Level stock at the end of its taxable year ended May 31, 1987, was $207,373.80. The result of CSI's positive adjustment to its investment basis in its Sea Level stock was the elimination of the balance of an excess loss account in its Sea Level stock that would have been created and would have been required to be included in CSI's

income under section 1.1502–19, Income Tax Regs.,[5] but for the inclusion of Sea Level's COD income in Sea Level's earnings and profits for the purpose of the investment basis adjustment rules of section 1.1502–32, Income Tax Regs.

The first issue we must decide in the instant case is whether the COD income that Sea Level realized but excluded from its income under section 108(a) increases its earnings and profits for purposes of the investment basis adjustment rules of section 1.1502–32, Income Tax Regs., where the consequence of such inclusion is the elimination of CSI's excess loss account in its Sea Level stock.

In *Woods Inv. Co. v. Commissioner*, 85 T.C. 274 (1985), we addressed a similar issue.[6] In *Woods*, the issue was whether, for purposes of section 1.1502–32, Income Tax Regs., a parent corporation of an affiliated group of corporations was entitled to compute the earnings and profits of its subsidiary corporations utilizing the straight-line method of depreciation required by section 312(k), rather than the accelerated method of depreciation the parent used to compute its consolidated taxable income. In *Woods*, the parent sold the stock of four of its subsidiaries during 1978. In accordance with section 1.1502–32(b), Income Tax Regs., the parent adjusted its basis in the stock of each of the subsidiaries to reflect changes in the subsidiaries' earnings and profits. The parent had previously used an accelerated method of depreciation when computing the affiliated group's consolidated taxable income, but section 312(k) required it to use the straight-line method of depreciation for purposes of calculating earnings and profits. By using the two different methods of depreciation, the excess depreciation (i.e., the depreciation that was actually claimed by the parent on its consolidated Federal income tax return over straight-line depreciation used by the parent to calculate the earnings and profits of its subsidiaries) was not reflected in the investment basis adjustments required by section 1.1502–32(b), Income Tax

---

[5] Sec. 1.1502–19(b)(2)(iii), Income Tax Regs., provides that a "disposition" of the stock of a subsidiary occurs on the last day of the taxable year in which "an indebtedness of the subsidiary is discharged if such discharge would have resulted in 'cancellation of indebtedness income' but for the insolvency of the subsidiary".

[6] As some of the applicable statutory and regulatory provisions have been set forth in full in *Woods Inv. Co. v. Commissioner*, 85 T.C. 274 (1985), we will not restate them in this opinion. We will, however, set forth other statutory and regulatory provisions that were not in issue in *Woods*.

Regs. Consequently, because the parent had a higher basis in the stock of its subsidiaries than it would have had if it had used an accelerated method of depreciation, the parent realized a smaller amount of gain on the sale of the stock of the subsidiaries. The higher basis was the result of the investment basis adjustment rules of section 1.1502–32, Income Tax Regs., which require that a parent's basis in the stock of its subsidiary be adjusted on the basis of the subsidiary's earnings and profits, which, in turn,. are required to be computed using the straight-line method of depreciation.

In *Woods,* we concluded that Treasury's decision to use earnings and profits, rather than taxable income or loss, as the measuring rod for adjusting basis under section 1.1502–32, Income Tax Regs., was a conscious and deliberate one, and that the consolidated return regulations are legislative in character. Accordingly, we held that, because the consolidated return regulations carry the force and effect of law, we would not invalidate them unless clearly contrary to the intent of Congress. *Woods Inv. Co. v. Commissioner, supra* at 279–281. We stated that, although section 312(k) was enacted subsequent to the adoption of section 1.1502–32, Income Tax Regs., the Government had been aware that the interplay of section 312(k) and section 1.1502–32, Income Tax Regs., created the opportunity for taxpayers to claim "double deductions". *Woods Inv. Co. v. Commissioner, supra* at 281. Despite its awareness of the design flaw in the regulations, the Government chose not to amend the consolidated return regulations to correct the problem. We addressed the Government's failure to amend section 1.1502–32, Income Tax Regs., as follows:

we conclude that * * * [the parent] reached the result mandated by respondent's consolidated return regulations and section 312(k) in computing its basis in the subsidiaries' stock. We believe that judicial interference sought by respondent is not warranted to alter this result. This Court will apply these regulations and the statute as written. * * *

If respondent believes that his regulations and section 312(k) together cause * * * [the parent] to receive a "double deduction," then respondent should use his broad power to amend his regulations. See *Henry C. Beck Builders, Inc. v. Commissioner,* 41 T.C. 616, 628 (1964). Since respondent has not taken steps to amend his regulations, we believe his apparent reluctance to use his broad power in this area does not justify judicial interference in what is essentially a legislative and administrative matter.

*Henry C. Beck Builders, Inc. v. Commissioner, supra* (Drennen, J., concurring at page 633).

[*Woods Inv. Co. v. Commissioner, supra* at 281–282.]

Additionally, we concluded that the rationale of *Ilfeld Co. v. Hernandez,* 292 U.S. 62 (1934), and section 1.1016–6(a), Income Tax Regs., were inapplicable because section 312(k) together with section 1.1502–32, Income Tax Regs., authorized the result we reached. *Id.* at 283.

In the instant case, petitioners contend that section 1.1502–19(a), Income Tax Regs., requires that the balance of an excess loss account be computed in accordance with the rules of section 1.1502–32, Income Tax Regs. Petitioners, relying on our holding in *Woods,* also contend that both section 312(l) and section 1.1502–32, Income Tax Regs., required them to add the full amount of Sea Level's COD income to Sea Level's earnings and profits and to adjust CSI's investment basis to reflect the increase in Sea Level's earnings and profits. In short, petitioners contend that the exclusion of Sea Level's COD income in the calculation of CSI's excess loss account under section 1.1502–19, Income Tax Regs., would be contrary to the explicit provisions of both section 312(l) and the consolidated return regulations.

Congress enacted section 312(l) as part of the Bankruptcy Tax Act of 1980, Pub. L. 96–589, 94 Stat. 3389, 3406. Section 312(l), in pertinent part, provides:

SEC. 312(l). DISCHARGE OF INDEBTEDNESS INCOME.—

(1) DOES NOT INCREASE EARNINGS AND PROFITS IF APPLIED TO REDUCE BASIS.—The earnings and profits of a corporation shall not include income from the discharge of indebtedness to the extent of the amount applied to reduce basis under section 1017.

Although the statutory language of section 312(l) is stated in the negative, the legislative history makes it clear that COD income, including amounts excluded from taxable income due to the debtor's insolvency, will increase earnings and profits to the extent a taxpayer's basis in depreciable assets is not reduced. *Wyman-Gordon Co. v. Commissioner,* 89 T.C. 207, 221 (1987).

Respondent contends that, despite the enactment of section 312(l) and our holding in *Woods Inv. Co. v. Commissioner, supra,* COD income should not be included in earnings and profits for purposes of determining the balance of a tax-

payer's excess loss account. Respondent argues that, because neither section 312(l) nor section 1.1502–32, Income Tax Regs., specifically requires the inclusion of Sea Level's COD income in its earnings and profits for purposes of the investment basis adjustment rules of section 1.1502–32, Income Tax Regs., Sea Level's COD income should not be included in its earnings and profits when calculating the balance of CSI's excess loss account under section 1.1502–19, Income Tax Regs. We disagree. In *Woods Inv. Co. v. Commissioner, supra,* we held that section 312(k) required that the earnings and profits of the parent's subsidiary corporations had to be computed using the straight-line method of depreciation for purposes of the investment basis adjustment rules of section 1.1502–32(b), Income Tax Regs. Neither section 312(k) nor section 1.1502–32, Income Tax Regs., however, specifically states that section 312(k) applies to the investment basis adjustment rules of section 1.1502–32, Income Tax Regs. Section 1.1502–32(b)(1), Income Tax Regs., only provides for a positive adjustment to the parent corporation's investment basis in its subsidiary's stock in an amount equal to the subsidiary's undistributed earnings and profits. The earnings and profits of a corporation are determined according to the provisions of section 312. Accordingly, respondent's contention that either section 312(l) or section 1.1502–32(b), Income Tax Regs., must specifically state that section 312(l) applies to the investment basis adjustment rules in order to include COD income in earnings and profits when computing the balance of an excess loss account is contrary to our holding in *Woods Inv. Co. v. Commissioner,* 85 T.C. 274 (1985).

In *Wyman-Gordon Co. v. Commissioner, supra,* we rejected a taxpayer's argument that section 312(l) supported its contention that the COD income of an insolvent second-tier subsidiary should be included in the second-tier subsidiary's earnings and profits for purposes of calculating the first-tier subsidiary's excess loss account on the grounds that section 312(l) was enacted subsequent to the taxable years in issue. We did, however, state the following with regard to the impact of section 312(l) on a parent corporation's calculation of its excess loss account balance:

The significance of the addition of section 312(l) to the Code cannot be understood without considering important amendments to section 108 that

also were made by the Bankruptcy Tax Act of 1980. That section was significantly rewritten to provide, among other things, that a taxpayer who under new section 312(l) excludes discharge of indebtedness income from taxable income due to insolvency and does not elect to reduce basis in its depreciable assets under section 1017, *must reduce certain other tax attributes.* The first tax attribute to be reduced under section 108 is the debtor's net operating losses. Thus, under amended sections 108 and 312(l), if these provisions were applicable to petitioners in 1978, * * * [the second-tier subsidiary] would be entitled to exclude the * * * discharge of indebtedness from its taxable income, and it would be entitled to increase its earnings and profits (and thereby reduce its excess loss account) by the amount of the discharge of indebtedness income. * * * [*Wyman-Gordon Co. v. Commissioner,* 89 T.C. at 222–223; fn. ref. omitted.]

The foregoing quote was based on our holding in *Woods Inv. Co. v. Commissioner, supra,* requiring that earnings and profits be computed, for purposes of the investment basis adjustment rules of section 1.1502–32, Income Tax Regs., in accordance with the provisions of section 312. *Wyman-Gordon Co. v. Commissioner, supra* at 218–219.

Approximately 6 months after we rendered our opinion in *Wyman-Gordon Co. v. Commissioner, supra,* Congress enacted section 1503(e).[7] Section 1503(e)(1) was amended in

---

[7] Sec. 1503(e) was enacted as part of sec. 10222(a) of the Omnibus Budget Reconciliation Act of 1987, Pub. L. 100–203, 101 Stat. 1330–410, which, in pertinent part, provides:

"(e) SPECIAL RULE FOR DETERMINING ADJUSTMENTS TO BASIS.—

"(1) IN GENERAL.—Solely for purposes of determining gain or loss on the disposition of intragroup stock, in determining the adjustments to the basis of such intragroup stock on account of the earnings and profits of any member of an affiliated group for any consolidated year—

"(A) such earnings and profits shall be determined as if section 312 were applied for such taxable year (and all preceding consolidated years of the member with respect to such group) without regard to subsections (k) and (n) thereof, and

"(B) earnings and profits shall not include any amount excluded from gross income under section 108 to the extent the amount so excluded was not applied to reduce tax attributes (other than basis in property).

"(2) DEFINITIONS.—For purposes of this subsection—

"(A) INTRAGROUP STOCK.—The term 'intragroup stock' means any stock which—

"(i) is in a corporation which is or was a member of an affiliated group of corporations, and

"(ii) is held by another member of such group.

Such term includes any other property the basis of which is determined (in whole or in part) by reference to the basis of stock described in the preceding sentence.

"(B) CONSOLIDATED YEAR.—The term 'consolidated year' means any taxable year for which the affiliated group makes a consolidated return."

(2) Effective date.—

(A) In general.—Except as provided in subparagraph (B), the amendment made by paragraph (1) shall apply to any intragroup stock disposed of after December 15, 1987. For purposes of determining the adjustments to the basis of such stock, such amendment shall be deemed to have been in effect for all periods whether before, on, or after December 15, 1987.

(B) Exception.—The amendment made by paragraph (1) shall not apply to any intragroup

the Technical and Miscellaneous Revenue Act of 1988 (TAMRA).[8] Amended section 1503(e)(1) provides that, solely for the purpose of determining gain or loss on a disposition of a subsidiary's stock and the amount of any inclusion in income of an excess loss account, the positive investment adjustment to the stock's basis under the consolidated return regulations will not include earnings and profits from COD income excluded from the subsidiary's taxable income under section 108, to the extent tax attributes, other than basis, are not reduced. Congress made the application of section 1503(e) prospective and adopted a generous transition rule.[9] As Congress made the amendment to section 1503(e) prospective only, we will follow our statement in *Wyman-Gordon* that section 312(l) would require a taxpayer to include COD income in earnings and profits for purposes of the investment basis adjustment rules (to the extent the taxpayer's basis in depreciable assets is not reduced). *Wyman-Gordon Co. v. Commissioner*, 89 T.C. at 223–224.

Respondent also contends that, because section 312(l) does not speak to the precise question in issue, we should defer to respondent's interpretation of section 312(l) and section 1.1502–32, Income Tax Regs., as argued in the instant case, even though respondent has not published any interpretation of such Code and regulatory provisions. Respondent relies on *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), for the proposition that an agency's interpretation of its own regulation is entitled to deference.

---

stock disposed of after December 15, 1987, and before January 1, 1989, if such disposition is pursuant to a written binding contract, governmental order, letter of intent or preliminary agreement, or stock acquisition agreement, in effect on or before December 15, 1987.

[8] Sec. 2004(j)(1)(A) of the Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. 100–647, 102 Stat. 3603–3604, amended sec. 1503(e)(1) to provide:

(1) IN GENERAL.—Solely for purposes of determining gain or loss on the disposition of intragroup stock and the amount of any inclusion by reason of an excess loss account, in determining the adjustments to the basis of such intragroup stock on account of the earnings and profits of any member of an affiliated group for any consolidated year (and in determining the amount in such account)—

TAMRA sec. 2004(j)(4) amended sec. 10222(b)(2) of the Omnibus Budget Reconciliation Act of 1987, Pub. L. 100–203, 101 Stat. 1330–411, to read as follows:

(B) Exception.—The amendment made by paragraph (1) shall not apply for purposes of determining gain or loss on any disposition of stock after December 15, 1987, and before January 1, 1989, if such disposition is pursuant to a written binding contract, governmental order, letter of intent or preliminary agreement, or stock acquisition agreement, in effect on or before December 15, 1987.

[9] If sec. 1503(e) were applicable to the facts of the instant case, Sea Level's COD income would not be included in its earnings and profits for purposes of determining CSI's excess loss account.

Although such an interpretation generally is entitled to deference, *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–414 (1945), in the absence of a contrary published, or at least longstanding, interpretation of the regulation in question, deference is not the rule. As the Supreme Court recently stated in *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 212 (1988):

> Despite the novelty of this interpretation, the Secretary contends that it is entitled to deference under *Young v. Community Nutrition Institute,* 476 U.S. 974, 980–981 (1986), *Chemical Mfrs. Assn. v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125 (1985), and *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–844 (1984). We have never applied the principle of those cases to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice. To the contrary, we have declined to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question, on the ground that "Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands." \* \* \* Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate. \* \* \*

In short, unless an agency's interpretation of a statute or a regulation is a matter of public record and is an interpretation upon which the public is entitled to rely when planning their affairs, it will not be accorded any special deference. *Southern Pac. Transp. Co. v. Commissioner,* 75 T.C. 497, 541–542 (1980). Respondent has not cited any published ruling, procedure, or practice[10] interpreting the interplay of section 312(1) and section 1.1502–32, Income Tax Regs. Consequently, we do not give any deference to respondent's position in the instant case.

Respondent next contends that the purpose of section 1.1502–19, Income Tax Regs., will be defeated if we adopt petitioner's position, and that we should therefore not follow our analysis in *Wyman-Gordon Co. v. Commissioner,* 89 T.C.

---

[10] The only prior articulation of the position taken by respondent in the instant case is a private letter ruling. See Priv. Ltr. Rul. 84–47–006 (July 27, 1984). In Priv. Ltr. Rul. 89–14–023 (Dec. 29, 1988), however, respondent appears to reach a contrary result. Sec. 6110(j)(3) provides that private letter rulings may not be used or cited as precedent, and therefore, may not be relied upon by the general public when planning their affairs. Consequently, private letter rulings are not entitled to the same judicial deference accorded to regulations. See *Knapp v. Commissioner,* 867 F.2d 749, 754 (2d Cir. 1989); affg. 90 T.C. 430 (1988); *Stubbs, Overbeck & Associates, Inc. v. United States,* 445 F.2d 1142, 1146–1147 (5th Cir. 1971). Accordingly, the interpretation of a statute or a regulation provided by the Commissioner in a private letter ruling is entitled to no more deference than a litigating position before this Court.

207 (1987), of the effect of section 312(l) on the investment basis adjustment rules of section 1.1502–32, Income Tax Regs. As to the effect of section 108(b) on section 1.1502–19, Income Tax Regs., respondent argues:

There is no nexus between the NOL carryovers of a subsidiary that are reduced under I.R.C. section 108 and the NOL's of the subsidiary already used by the group in excess of the group's investment in the subsidiary. Thus, even though reducing a subsidiary's NOL carryovers under I.R.C. section 108 may give rise to future consolidated income, that income will not correspond to the amount of the subsidiary's losses used by the group that exceeded the group's investment in the subsidiary. The only way to insure that the group will not deduct losses it has not "paid" for is to require that the [excess loss account] * * * be recognized as income.

*   *   *   *   *   *   *

Further, the reduced NOL's [under section 108(b)] should not be viewed as generating future income to "pay" for losses used by the group in excess of its investment in a subsidiary. This is contrary to the purpose of I.R.C. section 108 which requires that NOL's are instead reduced to "pay" for the exclusion of discharge of indebtedness income from gross income.

In short, respondent contends that, unless the balance in a parent corporation's excess loss account is included in the parent corporation's income when the subsidiary becomes insolvent, the consolidated group will have received tax benefits it will never have to "pay" for, which is contrary to the purpose of section 1.1502–19, Income Tax Regs. Respondent's argument rests upon the lack of correlation between the excess loss account provisions of section 1.1502–19, Income Tax Regs., and the tax attributes reduced under amended section 108(b). Respondent argues that we should therefore not follow our *Wyman-Gordon* analysis of the effect of section 312(l) on the investment basis adjustment rules.

We disagree. In the instant case, we conclude that our reasoning in both *Woods Inv. Co. v. Commissioner,* 85 T.C. 274 (1985), and *Wyman-Gordon Co. v. Commissioner, supra,* makes clear that the enactment of section 312(l) requires COD income to be included in earnings and profits for purposes of the investment basis adjustment rules of section 1.1502–32, Income Tax Regs.

Pursuant to section 1.1502–32(b)(1)(ii), Income Tax Regs., a positive basis adjustment is to be made in an amount equal to an allocable part of the undistributed earnings and profits of a subsidiary for the taxable year. Section 312(l) provides

that COD income is to be included in the earnings and profits of a corporation to the extent that the corporation's basis in its depreciable assets is not reduced. In *Wyman-Gordon Co. v. Commissioner*, 89 T.C. at 221, we stated that the balance in an excess loss account is determined according to the provisions of section 1.1502–32, Income Tax Regs. We find nothing in sections 1.1502–32 and 1.1502–19, Income Tax Regs., which prevents the application of section 312(l) when calculating a subsidiary's earnings and profits for the purpose of either the investment basis adjustment rules or the requirement that the balance of an excess loss account be included in a parent corporation's income when its subsidiary becomes insolvent. Consequently, COD income is included in a subsidiary's earnings and profits for purposes of computing the parent corporation's balance in its excess loss account in the stock of its subsidiary under section 1.1502–19, Income Tax Regs.

Respondent's argument that the inclusion of COD income in earnings and profits undermines the purpose of the excess loss account rules is a problem of respondent's own making: respondent chose to use earnings and profits as the measuring rod of the investment basis adjustment rules of section 1.1502–32(b), Income Tax Regs. Respondent was aware that section 312(l), which was enacted subsequent to the adoption of section 1.1502–32, Income Tax Regs., undermined the purpose of the excess loss account rules, but respondent chose not to amend the regulations to correct the problem. As we stated in *Woods,* we will apply the consolidated return regulations and the Code as written. Respondent's failure to amend either the investment basis adjustment rules of section 1.1502–32, Income Tax Regs., or the excess loss account rules of section 1.1502–19, Income Tax Regs., "does not justify judicial interference in what is essentially a legislative and administrative matter." *Woods Inv. Co. v. Commissioner,* 85 T.C. at 282. Accordingly, we hold that CSI is entitled to include Sea Level's COD income in Sea Level's earnings and profits (to the extent basis was not reduced under section 1017) for purposes of the investment basis adjustment rules of section 1.1502–32, Income Tax Regs., and that CSI properly included Sea Level's COD income in Sea Level's earnings and profits when computing its excess loss account balance under section 1.1502–19, Income Tax Regs.

Respondent alternatively contends that if we should decide that CSI is entitled to include Sea Level's COD income in Sea Level's earnings and profits for purposes of computing the balance of CSI's excess loss account under section 1.1502–19, Income Tax Regs., then the amount of COD income Sea Level is entitled to include in its earnings and profits should be limited to an amount equal to the tax attributes it reduced pursuant to section 108(b)(2)(A). In connection with this argument, respondent contends that the NOL's and NOL carryovers that Sea Level reduced pursuant to section 108(b)(2)(A) should be treated as "absorbed" for purposes of section 1.1502–32(b)(2)(ii), Income Tax Regs.[11]

We conclude that respondent's contention is without support in either the Code or the regulations. In *Wyman-Gordon Co. v. Commissioner, supra* at 223 n.13, we stated that a subsidiary's COD income would increase its earnings and profits without regard to any of the subsidiary's other tax attributes adjusted under section 108(b). Moreover, respondent has failed to cite, and we have not found, any applicable statutory or regulatory authority which would support respondent's position. Consequently, we hold that for the purposes of the investment basis adjustment rules, the amount of COD income Sea Level is entitled to include in its earnings and profits is not limited to the amount of tax attributes it reduced under section 108(b)(2)(A).

Respondent contends that NOL's and NOL carryovers that are reduced under section 108(b)(2)(A) should be considered as having been "absorbed" for purposes of section 1.1502–32(b)(2)(ii), Income Tax Regs. Respondent argues as follows:

NOL's and NOL carryovers must be reduced under I.R.C. section 108 as the price of eliminating the discharge of indebtedness income. If the taxpayer pays the price of excluding discharge of indebtedness income from gross income by reducing its existing NOL's or NOL carryovers, as required by Congress, it obtains a tax benefit from reducing the losses.

---

[11] Sec. 1.1502–32(b)(2)(ii), Income Tax Regs., provides in relevant part:

(2) Negative adjustment. The negative adjustment with respect to a share of stock which is not limited and preferred as to dividends shall be the sum of—

\*        \*        \*        \*        \*        \*        \*

(ii) An allocable part of any net operating loss or net capital loss incurred by the subsidiary in a prior separate return year, and of any portion of a consolidated net operating loss or consolidated net capital loss incurred by the group in a prior consolidated return year which is attributable to such subsidiary under section 1.1502–79(a)(3) or (b)(2), and which is carried over and *absorbed* in the taxable year; [Emphasis added.]

Thus, the reduction produces a tax benefit to the taxpayer and should be viewed as "absorbed" for tax purposes.

Additionally, it may be argued that a subsidiary's NOL carryover is utilized by a consolidated group when it is reduced under I.R.C. section 108 in the sense that the reduction of the NOL produces a positive adjustment to the parent's basis in the stock of the subsidiary. This occurs because under the alternative approach, a parent's basis in its subsidiary's stock is increased to account for the subsidiary's increase in earnings and profits from discharge of indebtedness income *to the extent the subsidiary's tax attributes are reduced* (the subsidiary's NOL carryovers being the first attribute to be reduced under I.R.C. section 108). Since the reduction (or utilization) of the loss produces a tax benefit to the parent in the form of an increase to the parent's basis in the stock of its subsidiary it should be viewed as an absorption and as such should cause the parent to reduce its basis in the subsidiary stock by the amount of the loss used up, under the second negative adjustment of Treas. Reg. section 1.1502–32(b)(2)(ii).

Under this view, discharge of indebtedness income creates a positive adjustment to the parent's basis in the stock of its subsidiary to the extent of the reduced NOL and a corresponding negative adjustment is caused by the absorption (I.R.C. section 108(b) reduction). The net effect of these two provisions is that the basis of the stock remains the same.

Finally, respondent cites the legislative history of section 1503(e) as further support for respondent's contention that a reduced NOL carryover should be treated as "absorbed" for purposes of section 1.1502–32(b)(2)(ii), Income Tax Regs.

Section 1.1502–32(b)(2)(ii), Income Tax Regs., was adopted in 1966, long before Congress enacted either section 312(l) or 108(b). See T.D. 6909, 1967–1 C.B. 240. Consequently, we do not believe that the term "absorbed", as used in section 1.1502–32(b)(2)(ii), Income Tax Regs., was ever intended to apply to the NOL's or the NOL carryovers of an insolvent subsidiary that are reduced pursuant to section 108(b)(2)(A). For purposes of section 1.1502–32(b)(2)(ii), Income Tax Regs., an NOL or an NOL carryover is usually considered to have been "absorbed" in the taxable year the NOL is used to offset the taxable income of the consolidated group. See Crestol et al., The Consolidated Tax Return, pars. 6.03[2], 8.02[3] (4th ed. 1988). The purpose of the negative adjustment under section 1.1502–32(b)(2)(ii), Income Tax Regs., for an NOL "absorbed" or used during a subsidiary's taxable year is to offset the positive adjustment required by section 1.1502–32(b)(1)(ii), Income Tax Regs.,[12] to the parent corporation's

---

[12] Sec. 1.1502–32(b)(1)(ii), Income Tax Regs., provides in relevant part:

investment basis in the stock of the subsidiary for an NOL attributable to the subsidiary which is *not* carried back and "absorbed" in a prior tax year. Peel, Consolidated Tax Returns, sec. 16.05, at 16–17 (3d ed. 1984) ("Treating a subsidiary's portion of a consolidated net operating loss * * * available for carryforward to subsequent years as a positive adjustment is an ingenious device for relating the adjustment to possible subsequent tax benefits." *Id.* sec. 16.04, at 14.). The potential tax benefit is the use of the NOL carryover attributable to the subsidiary to offset the affiliated group's consolidated income in a future tax year. The potential tax benefit does not include, as respondent contends, the reduction of a subsidiary's tax attributes pursuant to section 108(b)(2)(A). The reduction of tax attributes pursuant to section 108(b)(2)(A) is the price the taxpayer pays for the exclusion of COD income under section 108(a) and does not produce a tax benefit to the consolidated group that is "absorbed" within the meaning of section 1.1502–32(b)(2)(ii), Income Tax Regs.

Moreover, section 108(b)(4)(A)[13] provides that the tax attribute reductions that are required under section 108(b)(2) shall be made after the determination of the tax imposed by chapter 1 of the Code for the taxable year of the discharge of indebtedness. Section 1.1502–19(a), Income Tax Regs., provides that the balance of an excess loss account is required to be included in the parent corporation's income immediately before the disposition of the stock of its subsidiary. Consequently, the reduction of tax attributes under section 108(b)(2)(A) cannot be considered to have been "absorbed" for purposes of section 1.1502–32(b)(2)(ii), Income Tax Regs., until the next taxable year. Because the consolidated regulations do not preclude, indeed, do not even mention, the

---

(b) Stock which is not limited· and preferred as to dividends. (1) Positive adjustment. The positive adjustment with respect to a share of stock which is not limited and preferred as to dividends shall be the sum of—

\*        \*        \*        \*        \*        \*        \*

(ii) An allocable part of the portion of any consolidated net operating loss or consolidated net capital loss for the taxable year which is attributable to such subsidiary under section 1.1502–79(a)(3) or (b)(2), and which is not carried back and *absorbed* in a prior taxable year; * * * [Emphasis added.]

[13] Sec. 108(b)(4)(A) provides:

(A) REDUCTIONS MADE AFTER DETERMINATION OF TAX FOR YEAR.—The reductions described in paragraph (2) shall be made after the determination of the tax imposed by this chapter for the taxable year of the discharge.

application of section 108(b)(4)(A), we conclude that the provisions of that section are applicable in the instant case. Sec. 1.1502–80, Income Tax Regs. Consequently, even if we were to accept respondent's interpretation of the term "absorbed" in section 1.1502–32(b)(2)(ii), Income Tax Regs., the outcome respondent seeks in the instant case would not be possible.

Finally, respondent's reliance on the legislative history of section 1503(e) as support for the argument that NOL's which are reduced under section 108(b)(2)(A) should be considered "absorbed" for purposes of section 1.1502–32(b)(2)(ii), Income Tax Regs., is misplaced. The conference report to the Omnibus Budget Reconciliation Act of 1987, Pub. L. 100–203, 101 Stat. 1330, states that section 1503(e) eliminates the positive basis adjustment for earnings and profits arising from COD that has been excluded from a subsidiary's taxable income "where the amount excluded was applied to reduce tax attributes, such as net operating losses, that were immediately reflected in basis under the consolidated return regulations." H. Conf. Rept. 100–495, at 963 (1987), 1987–3 C.B. 193, 243. The conference report provides no analysis to support such an interpretation. Moreover, it is well settled that the view of one Congress as to the construction of a statute or a regulation adopted many years before is not entitled to substantial weight. See *Mars, Inc. v. Commissioner,* 88 T.C. 428, 435 (1987) (citing *United States v. Southwestern Cable Co.,* 392 U.S. 157, 170 (1968)).

For the reasons stated above, we reject respondent's alternative argument. We hold that, for purposes of the investment basis adjustment rules of section 1.1502–32, Income Tax Regs., Sea Level is entitled to include its COD income in its earnings and profits, and CSI is entitled to adjust its investment basis in its Sea Level stock to reflect the increase in Sea Level's earnings and profits. Section 1.1502–19(a), Income Tax Regs., provides that the balance of an excess loss account is to be computed in accordance with the rules of section 1.1502–32, Income Tax Regs. Accordingly, no further negative adjustment to CSI's basis in its Sea Level stock is required.

In order to reflect the foregoing,

*Decision will be entered for petitioners.*

---

[1] All Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code.