**IU INTERNATIONAL CORPORATION, Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 96–5084.

United States Court of Appeals, Federal Circuit.

July 1, 1997.

Irving Salem, Latham & Watkins, New York City, argued, for plaintiff–appellant. With him on the brief was Thomas G. Gallatin, Jr.

Mildred L. Seidman, Attorney, Tax Division, Department of Justice, Washington, DC, argued, for defendant–appellee. With her on the brief were Loretta C. Argrett, Assistant Attorney General, Gary R. Allen, Chief, Appellate Section, and Jonathan S. Cohen, Attorney.

Before PLAGER, CLEVENGER, and RADER, Circuit Judges.

RADER, Circuit Judge.

In this taxpayer refund suit, IU International Corporation (IU) claims the benefit of an increased stock basis in one of its affiliated subsidiary companies as a result of certain adjustments required during IU's corporate restructuring. The United States Court of Federal Claims properly found no authority in the Internal Revenue Code (I.R.C. or 26 U.S.C.) or Treasury regulations (26 C.F.R) that would allow IU to adjust its basis. *See IU Int'l Corp. v. United States,* 34 Fed. Cl. 767 (1996). Accordingly, this court affirms the trial court's grant of summary judgment for the Government.

## I.

IU is the parent company of an affiliated group of corporations that have filed consolidated tax returns at all times relevant to this case. As of December 7, 1981, IU owned all the stock in its immediate subsidiary, Unijax, Inc. (Unijax). In turn, Unijax owned all the stock in its four subsidiaries—General Waterworks Corp. (GWC), Conversion Systems, Inc. (Conversion), Biggers Brothers, Inc. (Biggers), and International Mills Service (IMS).

In an internal corporate reorganization on December 11, 1981, Unijax distributed the stock of its four subsidiaries to IU in a spin-off transaction qualifying as a tax-free distribution under I.R.C. § 355. After that time, IU directly owned all the stock in Unijax and the four other subsidiary companies, including GWC.

In September 1982, IU sold about 41% of its stock in GWC to Lyonnaise American Holding, Inc. (Lyonnaise). In connection with this sale, IU reported a capital loss on its 1982 federal income tax return. Later,

IU filed a claim for a tax refund for tax year 1982 in which IU reported an increased capital loss from the sale of GWC. IU claimed the additional capital loss because of its alleged entitlement to a higher basis in GWC's stock. Specifically, IU sought to increase its 1981 year-end basis in GWC's stock by $27 million, the amount of an adjustment IU was required to make in connection with its I.R.C. § 355 reorganization.

If IU increases its basis in GWC's stock, it increases its capital loss, because its capital loss is the difference between IU's basis in the stock and IU's selling price. This reduces IU's tax liability for 1982, the tax year in which the sale occurred. It also results in a loss carryback to tax year 1979, for which IU also claims the right to a refund. The total value of IU's refund claim is $1,323,788, plus interest.

After the Internal Revenue Service (IRS) denied IU's refund claim, IU filed a complaint in the Court of Federal Claims seeking a refund of federal income taxes. Acting on cross-motions for summary judgment, the trial court denied IU its claimed refund. IU now appeals.

## II.

### A.

The "fantastic labyrinth" that is our tax code, *see* Learned Hand, *Eulogy of Thomas Walter Swan*, 57 Yale L.J. 167, 169 (1947), abounds with intricate and interrelated provisions. This case requires us to consider three such provisions and their potential interrelations.

The provision primarily at issue in this case, Treas. Reg. (26 C.F.R.) § 1.1502–32(b)(1)(i) (1981), resides in the Consolidated Return Regulations, which govern the tax obligations of a family of affiliated companies filing a consolidated tax return. *See* Treas. Reg. § 1.1502 (herein the Consolidated Return Regulations); *see also* I.R.C. § 1502 (granting the Secretary of the Treasury broad powers to promulgate rules pertaining to income tax treatment of affiliated companies filing a consolidated return). Among other things, the Consolidated Return Regulations govern the calculation and adjustment of each affiliated corporation's bases in the stock of its subsidiaries. *See* Treas. Reg. § 1.1502–32 (the 1966 Stock Basis Regulations).[1] The 1966 Stock Basis Regulations require a yearly adjustment, which may be positive or negative, to a company's basis in the stock of each subsidiary. *See* Treas. Reg. § 1.1502–32(a) ("As of the end of each consolidated return year, each member owning stock in a subsidiary shall adjust the basis of such stock in the manner prescribed in this section.").

The particular adjustment at issue in this case is set out in Treas. Reg. § 1.1502–32(b)(1)(i):

> The positive adjustment with respect to a share of stock which is not limited and preferred as to dividends shall be the sum of -
>
> (i) *An allocable part of the undistributed earnings and profits of the subsidiary for the taxable year;*

Treas. Reg. § 1.1502–32(b)(1) (emphasis added). This adjustment takes account of newly accumulated value in each subsidiary within the affiliated group. In a multi-tiered group of companies, "the adjustment with respect to the stock of the higher tier subsidiary shall not be made until after the adjustment is made with respect to the stock of the lower tier subsidiary." Treas. Reg. § 1.1502–32(a). By this method, the increased value in each subsidiary cascades up the corporate chain, ultimately accumulating in the group's common parent company.

Normally, an affiliated group makes its required Treas. Reg. § 1.1502–32(b)(1)(i) adjustments annually at the end of its tax year. However, in cases such as this one where a subsidiary is spun-off or otherwise disposed of during the tax year, the IRS requires an interim adjustment "as of the date of disposition." Treas. Reg. § 1.1502–32(a).

---

1. The provisions of Treas. Reg. § 1.1502–32 are known as the "Stock Basis Regulations." This case is governed by a version of those Regulations promulgated in 1966. Since these Regulations were later amended in 1994, this court refers throughout this opinion to the "1966 Stock Basis Regulations" to distinguish the later version.

In the present case, the IU group made its section 1.1502–32(b)(1)(i) adjustments on December 11, 1981, the date of its reorganization. At that time, Unijax increased its bases in all its subsidiaries (GWC, Conversion, Biggers, and IMS) by about $5 million to reflect the year-to-date undistributed earnings and profits of those companies. At the same time, IU increased its basis in Unijax by $5 million (to reflect the adjustment to Unijax's basis in its subsidiaries) plus an additional $12 million in Unijax's own year-to-date undistributed earnings and profits. Thus, on December 11, 1981, IU adjusted its basis in Unijax by a positive $17 million.

The other two provisions at issue in the case relate to IU's tax-free reorganization under I.R.C. § 355. In relevant part, section 355 provides a tax-free transaction in which a "distributing company" (Unijax) spins off its subsidiary, or "controlled corporation" (GWC and its sister corporations), to its parent company, or "distributee" (IU). *See* I.R.C. § 355. When an affiliated group undertakes such a reorganization, the Internal Revenue Code requires that the involved companies reallocate their bases in the stock of their subsidiaries and reallocate the accumulated earnings and profits as between those subsidiaries. Internal Revenue Code §§ 358 and 312 require these adjustments.

Section 358 of the Internal Revenue Code and affiliated regulations require an adjustment in the bases of companies involved in an I.R.C. § 355 tax-free spin-off. *See* I.R.C. § 358(b); Treas. Reg. § 1.358–2(a)(2). The distributing corporation (Unijax) has a certain basis in the hands of its parent corporation (IU). That basis is attributable, in part, to the market value of the distributing corporation (Unijax) itself and, in part, to the market value of the controlled corporations (GWC and its sister corporations). Section 358 allocates an appropriate portion of the distributing corporation's basis to the controlled corporations based on the corporations' relative market values. This adjustment reflects the fact that a portion of the value held by the distributing company be-

fore the distribution is thereafter held directly by the distributee (IU).

IU made its I.R.C. § 358 adjustment on December 11, 1981, the date of the spin-off transaction. Before the adjustment, IU's basis in Unijax was about $282 million. IU reallocated this basis, based on market value of the respective companies, approximately as follows: $90 million to Unijax; $80 million to GWC; and a total of $112 million to the other subsidiaries. Thus, IU reallocated $80 million of Unijax's basis to GWC on this date.

Finally, I.R.C. § 312(h)(1) and affiliated regulations require a reallocation of accumulated, undistributed earnings and profits from the distributing corporation (Unijax) to the controlled corporations (GWC and its sister companies). *See* I.R.C. § 312(h); Treas. Reg. §§ 1.312–10(a), (b). According to the relevant regulation:

> [T]he earnings and profits of the distributing corporation immediately before the transaction shall be allocated between the distributing corporation and the controlled corporation.

Treas. Reg. § 1.312–10(a).[2] This allocation, like the I.R.C. § 358 allocation, is based upon the relative market values of both companies. *See id.*

IU made its I.R.C. § 312(h)(1) adjustment on December 11, 1981. Before the adjustment, Unijax had accumulated, undistributed earnings and profits totaling $95 million. GWC's share of this accumulated amount was about $27 million. Thus, IU allocated $27 million of Unijax's earnings and profits to GWC and reduced the amount allocated to Unijax by an equal amount.

**B.**

The parties do not dispute the propriety or accuracy of all of IU's adjustments described above. The dispute arises with respect to a fourth adjustment that IU later sought to make.

---

**2.** Section 1.312–10(b), which is the applicable provision in this case, provides that the reallocated earnings and profits shall be the lesser of the amount specified in section 1.312–10(a) or the net worth of the controlled corporation. In this case, section 1.312–10(a) provides the relevant number.

At the conclusion of tax year 1981, IU again adjusted its bases in its subsidiaries under Treas. Reg. § 1.1502–32(b)(1)(i) to reflect newly-accumulated, undistributed earnings and profits earned by the subsidiaries. When IU initially filed its 1981 return, its section 1.1502–32(b)(1)(i) adjustment for GWC reflected only those undistributed earnings and profits that GWC had actually accumulated since December 11, 1981, the date of its prior section 1.1502–32(b)(1)(i) adjustment. However, by its refund claim, IU sought to further increase its basis in GWC by $27 million, the amount of Unijax's earnings and profits allocated to GWC during the spin-off transaction.

The question presented by this appeal is whether IU's section 312(h)(1) adjustment to the accumulated earnings and profits of GWC is "undistributed earnings and profits of [GWC] for the taxable year" such that it increases IU's year-end basis in GWC under Treas. Reg. § 1.1502–32(b)(1)(i). For the reasons set forth below, this court concludes that it is not.

### III.

■ The Court of Federal Claims' grant of summary judgment is subject to complete and independent review by this court. *See Cohen v. United States*, 995 F.2d 205, 207 (Fed.Cir.1993). Because the parties have stipulated to the essential facts, the meaning of the relevant statutes and regulations dictates the outcome of this case.

■ Treasury Regulation § 1.1502–32(b)(1)(i) requires a step-up in basis for "undistributed earnings and profits of the subsidiary for the taxable year." This phrase specifies the *current* earnings and profits of the subsidiary—those actually earned by the subsidiary during the tax year. These earnings and profits do not include all *accumulated* earnings and profits that may amass in a corporation over time, but only so much as is actually earned and accumulated in the taxable year. *Cf.* I.R.C. § 316(a) (distinguishing between "earnings and profits accumulated" and "earnings and profits of the taxable year"). Thus, current, as opposed to accumulated, earnings and profits trigger Treas. Reg. § 1.1502–32(b)(1)(i). This trig-

ger comports with the purpose of the regulation, which is to take annual account of newly-accumulated value that is retained by the subsidiary.

Internal Revenue Code § 312(h), by contrast, involves an allocation of *accumulated* earnings and profits between the distributing and controlled corporations. The relevant provisions do not call for an annual adjustment to earnings and profits, but rather require a one-time allocation of cumulative earnings and profits to account for the I.R.C. § 355 reorganization.

IU argues that "the increase in the [earnings and profits] resulting from a spin-off of an existing subsidiary should [ ] be treated as the [earnings and profits] of the distributed subsidiary for the taxable year of the receipt, notwithstanding its previous status as accumulated [earnings and profits] of the distributing corporation." Appellant's Brief, p. 18. The words of the statute, however, as noted above, do not support this reading. The Internal Revenue Code could have indicated clearly that a section 312(h)(1) adjustment is deemed current earnings or profits of the controlled corporation. Instead, the Code uses the word "allocation" in section 312(h)(1), an indication that the required adjustment is an assigned value, rather than an earned value. As the trial court properly recognized, the distribution-related allocation of Unijax's accumulated earnings and profits to GWC did not amount to an increase in GWC's "undistributed earnings and profits ... for the taxable year" under Treas. Reg. 1.1502–32(b)(1)(i). Thus, the allocation does not affect IU's basis in GWC.

It is I.R.C. § 358, not Treas. Reg. § 1.1502–32(b)(1)(i), that dictates the basis adjustments required for a I.R.C. § 355 spin-off transaction. As set out above, that provision required IU to allocate a portion of its basis in Unijax to GWC and its sister corporations. IU properly performed that adjustment on the date of the transaction. The tax code requires no further adjustment to IU's basis in GWC on account of the spin-off transaction.

This court notes that this interpretation comports with the underlying economic reali-

ties. The purpose of Treas. Reg. § 1.1502–32(b) is to adjust annually a parent's basis in its subsidiary for newly-created value held by the subsidiary—i.e., the subsidiary's current earnings and profits. The adjustment does not cover all undistributed earnings and profits, but only so much as the subsidiary earned "for the taxable year." In this case, IU had already adjusted its basis to reflect Unijax's current earnings and profits (which amounted to $17 million through December 11, 1981). To the extent allowable, IU had likewise adjusted its basis in Unijax to reflect the rest of Unijax's $95 million in earnings and profits in previous years. IU may not claim another adjustment merely because those earnings and profits were reallocated to another of its subsidiaries.

Along these lines, IU argues that its basis in Unijax did not include at least $28.6 million of Unijax's $95 million in undistributed earnings and profits. Apparently, IU had never included that amount in a step-up in basis under the 1966 Stock Basis Regulations. Thus, according to IU, at least this portion of Unijax's undistributed earnings and profits would not provide a double-addition to IU's basis in GWC. However, this argument misses the point. The $28.6 million in earnings and profits to which IU refers was not cognizable under the 1966 Stock Basis Regulations in the hands of Unijax. Those same earnings and profits do not become cognizable under the 1966 Stock Basis Regulations merely because a portion is reallocated to another company. To the extent that the 1966 Stock Basis Regulations authorized IU to a step-up in basis for Unijax's $95 million in undistributed earnings and profits, IU had already taken that step-up at the time the earnings and profits accrued. It is not entitled to a second step-up merely because those accumulated earnings and profits were later reassigned to another company.

Finally, IU cites several cases for the proposition that courts apply the tax laws strictly as written without consideration of the underlying economics. *See Woods Inv. Co. v. Commissioner*, 85 T.C. 274, 282, 1985 WL 15380 (1985) (Tax Court stated that it would "apply these regulations and the stat-ute as written"), *acq.*, 1986–2 C.B. 1; *CSI Hydrostatic Testers, Inc. v. Commissioner*, 103 T.C. 398, 403–05, 1994 WL 466342 (1994), *aff'd per curiam*, 62 F.3d 136 (5th Cir.1995). This court does not question the integrity of the principle applied in these cases. Indeed, such a complex fabric of interrelated provisions as the Internal Revenue Code and its related regulations demands strict adherence lest courts find themselves unwittingly choosing preferred economic outcomes rather than defined legal results under the Code. However, that general principle does not affect the outcome in this case, where the statutes and regulations, as written, provide no authority for IU's claimed adjustment.

For all these reasons, this court concludes that the IRS and the Court of Federal Claims properly interpreted the relevant statutes and regulations to foreclose IU's claimed adjustment. The decision is affirmed.

### COSTS

Each party shall bear its own costs.

*AFFIRMED.*